HARRY W. WENDEL, RESPONDENT, v. CITY ICE COMPANY OF KANSAS CITY, APPELLANT.*

Kansas City Court of Appeals.   December 2, 1929.

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, section 2697, p. 756, n. 24; section 3018, p. 1038, n. 85; Damages, 17CJ, section 416, p. 1097, n. 6; Evidence, 23CJ, section 1940, p. 124, n. 25; Juries, 35CJ, section 439, p. 394, n. 34; p. 395, n. 48; Motor Vehicles, 42CJ, section 1082, p. 1254, n. 53; Trial, 38Cyc, p. 1667, n. 85.

*Mont T. Prewitt* and *Charles N. Sadler* for respondent.

*Horace Guffin* and *George W. Meyer* for appellant.

BARNETT, C.—This is an action to recover damages for personal injuries. Plaintiff, respondent here, recovered judgment in the sum of $1750 and defendant appealed. Plaintiff's injuries were caused by a collision of a heavy ice truck operated by defendant with a street car on which plaintiff was riding and on which he was employed as a motorman. The collision occurred on 15th Street in Kansas City, Missouri, at a point about 150 feet west of Topping Avenue. Fifteenth Street runs east and west and street car tracks are laid on either side of the center of the street. The distance between the two tracks is about five feet and two inches. Fifteenth Street is sixty feet wide and is paved with cobblestones between the rails of the tracks and with asphalt outside of the rails. At the time of the collision plaintiff was driving the street car in a westerly direction on the north track on Fifteenth Street. At the same time defendant's large ice truck, loaded with ice, was traveling up a slight grade in an easterly direction and was straddling the north rail of the south street car track on Fifteenth Street. The street car and the truck had been traveling toward each other for several blocks.

Plaintiff's evidence tends to show that the truck was traveling fifteen to twenty miles per hour and that the street car was moving about eight miles per hour but had slowed down to five miles per hour; that when the truck and the street car were about fifteen feet apart, the truck suddenly swerved in a northeasterly direction and

154

ran the front wheel of the truck against the side of the street car at a point about ten or twelve feet from the front end of the car, thereby causing it to leave the track and veer to the north a distance of about twenty-two feet, coming to a stop with the front wheels of the street car against the north curb of Fifteenth Street.

Defendant's evidence is to the effect that the truck was traveling eight to twelve miles per hour and the street car from twenty to thirty miles per hour; that the ice truck did not turn toward the street car but traveled in a straight course and passed the front end of the street car, and an iron bar which projected about eighteen inches from the south side of the street car, struck the left front wheel of the truck and swerved the truck from its position into the street car, thereby causing the front end of the street car to jump the track; that the iron draw bar was fastened at one end with a bolt and worked on a hanger at the other end; that unless this bolt was broken the draw bar would not have extended beyond the body of the car more than two inches. The driver of the truck testified that he shifted the gears just before the collision and was driving with one hand on the steering wheel, the other on the gear shift, and his left foot on the clutch while shifting gears; that just before the collision something jerked the steering wheel out of his hand. He further testified that he was looking ahead and saw the street car when it was three and one-half blocks, or about five hundred feet away from him, but did not see the iron draw bar extending from the side of the car; that his eyesight was good and there was no obstruction between him and the street car; that the brakes and steering gear on the truck were in good working order, and by a mere twist of the steering wheel he could have turned the truck to the right or left; that he could have stopped the truck under the conditions as they existed, within six inches to one foot if traveling at eight miles per hour, within two or three feet if traveling fifteen miles per hour and within six to ten feet if traveling twenty miles per hour.

Defendant's witness, Culbertson, was in an automobile following the street car and first observed the car when it was six or eight blocks ahead of him, and at that time, saw the iron draw bar extending from the side of the car.

Witness Foster followed behind the truck in a Ford car. He saw the draw bar hit the wheel of the truck.

Witness Cristy was driving in an automobile behind the street car, and before the collision, saw the draw bar on the side of the street car.

Other witnesses standing on the street near the scene of the collision, saw the iron draw bar on the side of the car.

The truck driver's eyesight was good. He was looking ahead and saw the street car when it was three and one-half blocks away. There were no obstructions between him and the street car.

Plaintiff's evidence is to the effect that when the truck was within fifteen feet of the street car, it suddenly turned toward the street car, and after passing the end of the car a distance of ten or twelve feet, the collision occurred. This evidence, together with the undisputed evidence of defendant's own witness, that the truck could have been stopped within a distance of from six to ten feet, or turned aside by a mere twist of the steering wheel, raises an issue of fact as to whether or not the driver of the truck could have avoided the collision by the exercise of ordinary care.

Defendant proved by its own witness, the truck driver, that going at twenty miles per hour, the highest rate the truck was shown to have been traveling he could have stopped it, under the conditions then existing, within from six to ten feet, or could have turned it to the right or left by a mere twist of the steering wheel. The only disputed question was whether or not after the driver of the truck did, or by the exercise of ordinary care could have discovered the peril, there was yet sufficient distance between the car and the truck, in which the truck could have been stopped or turned aside and the collision avoided.

Plaintiff's attorney, on the *voir dire*, asked the following questions:

"I want to ask you gentlemen whether or not any of you are in any way connected with Bruce Dodson at his place of business on 27th Street west of Main—about a block west of Main?

"Are any of you in the employ of Mr. Bruce Dodson in any way or have you ever been connected with Mr. Bruce Dodson? He is in the insurance business.

"I want to ask you gentlemen whether any of you are financially interested in, or hold stock or have insurance in the Casualty Reciprocal Exchange, which I understand is a mutual company. Are any of you in any way connected with that company?"

Before the jury was so interrogated, it was admitted, out of the presence and hearing of the jury, that defendant was indemnified in the Casualty Reciprocal Exchange; that such exchange was a mutual company; that it had an office in Kansas City, and Bruce Dodson was attorney in fact for said exchange.

Plaintiff's main instruction directed a·verdict for plaintiff if the jury found certain facts to be true. The instruction was based upon the humanitarian doctrine. Among other things, it required the jury to find that plaintiff was oblivious to the peril and that defendant's driver by the exercise of ordinary care could have seen the street car approaching and in a position of peril where it would be

struck by the motor truck if the motor truck was not swerved from its course and that defendant's driver saw or by the exercise of ordinary care could have seen that plaintiff was oblivious to the peril, in time thereafter, by the exercise of ordinary care on the part of the motor truck driver, to have stopped said truck or to have slackened the speed thereof or swerved the same and thereby have avoided striking the car. But it did not in express terms require the jury to find that the driver after discovering plaintiff's peril *"had the present ability with the means at hand to avoid the collision without injury to himself or others."*

## OPINION.

It is first contended that the instruction purported to cover the entire case and directed a verdict but omitted an essential element of plaintiff's prima-facie case because it did not require the jury to find that the motor truck driver, after discovering plaintiff's peril *"had the present ability with the means at hand to avoid the collision without injury to himself or others."* The instruction did require the jury to find that the driver of the truck, by the exercise of ordinary care, could have avoided the collision. We can understand how a jury could be misled into believing that a verdict should be returned for plaintiff if it was clear that he could have stopped in time to have avoided a collision even though it would have been dangerous to the defendant or others to do so, unless they were instructed otherwise. We cannot believe that a jury would find that a plaintiff could have stopped or could have taken other necessary precautions if he did not have the means at hand. The statement of the evidence shows that the omission complained of had to do with matters that were not in dispute. There is no evidence that defendant did not have the means at hand to stop the motor truck nor that it would have been dangerous to anyone for him to do so. The evidence of both parties is to the contrary. It is never error for the court to assume as a fact that which is conceded or not disputed. [Montgomery v. Hammond Packing Co., 217 S. W. 867 and authorities there cited; Taylor v. Iron Co., 133 Mo. 349; Cornovski v. St. Louis Transit Co., 106 S. W. 51; Fields v. The Wabash, St. Louis, etc., R. Co., 80 Mo. 203.] Accordingly it has been held that an instruction on the humanitarian doctrine is not erroneous which fails to require the jury to find that defendant could have stopped without danger to himself when there was no evidence that it would have been dangerous for him to do so. [Kammer v. Loschke, 238 S. W. 1088.]

It is claimed that the court erred in permitting the attorney for respondent to examine the prospective jurors on the *voir dire* concerning their connection with Bruce Dodson and the Casualty Re-

ciprocal Exchange. A reference to the abstract will show that out of the presence of the jury it was admitted that Bruce Dodson was the attorney in fact of the Casualty Reciprocal Exchange; that that company was a mutual company, but that defendant's counsel was not familiar with the exact nature of the organization. Plaintiff's attorney asked the defendant whether the Casualty Reciprocal Exchange was a Kansas City concern. Defendant's counsel answered: "Well, the Casualty Reciprocal Exchange has Kansas City offices." It is settled beyond all controversy that when it appears that defendant is insured against loss arising from acts with which it stands charged in the suit on trial, plaintiff has a right to determine whether or not the jurors have any interest in the insurance company in order that he may intelligently exercise his right of peremptory challenge. It is equally plain that the plaintiff has the right to find out whether any of the prospective jurors have such a connection with the attorney in fact. But it is claimed that in this case plaintiff's attorney acted in bad faith, and that this is evidenced by the fact that he told the prospective jurors that Bruce Dodson was in the insurance business; that he asked if any of the jurors had stock or insurance in the Casualty Reciprocal Exchange, and added the statement "which I understand is a mutual company." It is claimed that by this method the plaintiff unnecessarily told the jury that the defendant carried insurance; that it was not necessary to reveal the fact that Bruce Dodson was in the insurance business; that it served no legitimate purpose to ask if any of the jurors had insurance in the Casualty Reciprocal Exchange; and that it was entirely unnecessary that the jurors be told that the company was a mutual company. Appellant leans very heavily upon the case of Pettit v. Goetz Sales Co., 281 S. W. 973. That case was decided upon the authority of Chambers v. Kennedy, 274 S. W. (Mo. App.) 726; but the constitutional provision which required this court to follow Chambers v. Kennedy, then requires us to disregard it now, because in Smith v. Star Cab Co., 19 S. W. (2d) 467, the Supreme Court stated that Chambers v. Kennedy had been, in effect, overruled. In our examination of some thirty-five or forty cases we find that the courts of this State have repeatedly said that examination of prospective jurors concerning their connection with an insurance company is proper if conducted in good faith, but we do not find any case that attempts to lay down any general rule as to what constitutes good faith. The briefs in this case are sufficient to convince us that the rule should be stated. If an insurance company is actually interested in the result of a trial, then plaintiff's counsel may ascertain what connection, if any, the prospective jurors have with the underwriter. It has many times happened that when plaintiff's counsel attempted to determine whether or not an insurance com-

pany was interested in the result, counsel for defendant has refused to answer or has refused to give the name of the insurance company. In such a case plaintiff's counsel has reasonable cause to believe that an insurance company is interested in the result, and it is then permissible for him to interrogate the prospective jurors concerning their relation to the insurance company concerning which defendant's attorney refuses to give any information. If it appears from the record that there is reasonable cause to believe that an insurance company is interested, but plaintiff's attorney has not been able to obtain the name of the insurance company, then plaintiff's counsel may ask if the prospective jurors are connected ·with any insurance company. [Craven v. Halpin-Boyle Const. Co., 15 S. W. (2d) 853; Maurizi v. Western Coal & Mining Co., 11 S. W. (2d) 268; Floun v. Birger, 296 S. W. 203; Melican v. Whitlow Const. Co., 278 S. W. 361; Smith v. Scudiero, 204 S. W. 565.] If the record shows that an insurance company is interested in the result, or that plaintiff has reasonable cause to believe that this is so, then legal grounds exist for conducting the examination on the *voir dire*. This being true, it is not necessary for the plaintiff to prove his motive or lack of motive for asking the questions. The case of State ex rel. Life Ins. Co. v. Allen, 310 Mo. 378, was a suit on a policy of insurance which provided that all statements of the appellant, in the absence of fraud, should be considered representations and not warranties. The defense was that defendant died from certain diseases which he had at the time he signed the application, but which he falsely stated he did not have. The St. Louis Court of Appeals held in Simpson v. Met. L. Ins. Co., 263 S. W. 521, that defendant was not entitled to an instruction requiring the jury to find for defendant if insured died with diabetes and on the date of making his application knew he had diabetes; because the instruc· tion failed to further require the jury to find that the representations were made for a fraudulent or corrupt motive. *certiorari* the Supreme Court rejected this view and said: "Whether, therefore, the false statements of the insured be regarded as an actual fraud, made with the intention of deceiving the medical examiner, or a legal fraud which consists of a misstatement of a matter within the personal knowledge of the insured or of such a character that the insured must have regarded it as within the personal knowledge of the former, it constitutes, whether it be one or the other, such a false representation as should be held to avoid the policy." In the case of Mutual Life v. Hilton-Green, 241 U. S. 613, the court held that certain incorrect statements in an application for life insurance were material representations and if known to be untrue by the insured when they were made, they invalidated the policy without further proof of actual conscious design to defraud. Under section

28 of the Federal Judicial Code a suit involving more than $3000, exclusive of interest and costs, may be removed from the State court to a Federal Court by a nonresident defendant if diversity of citizenship exists. But if there be more than one defendant and one is a resident of the State where the suit was brought removal may not be had. Nevertheless, it has been repeatedly held by the Federal courts that if a resident is joined as a defendant, removal may nevertheless be had if the joinder is in bad faith. But for the joinder to be in bad faith it must be shown that the resident defendant was not liable and that there were no reasonable grounds to believe that he was. [Ala. Great So. Ry. Co. v. Thompson, 200 U. S. 206.] If the co-defendants are manifestly not jointly liable removal will be permitted, but it must be clearly proved that the local defendant had no connection with the transaction which is the foundation of the suit. Where it clearly appears that the local defendant has no connection with the cause a plaintiff will not be permitted to claim that he willfully closed his eyes to the information within his reach which showed that there was no reasonable ground to believe that the resident defendant was liable. [3 Foster's Federal Practice (6 Ed.), p. 3011.] On the other hand, if the resident defendant is liable, or if there is reasonable cause to believe that he is liable, so that it was proper for plaintiff to contend that he was, then the plaintiff's good faith may not be questioned upon the ground that the resident defendant was wholly impecunious and that plaintiff had no hope of being able to collect a judgment against him, but only joined him as a defendant to prevent a removal to Federal Court. [Williams v. Short, 268 S. W. 706; Whiteaker v. Railroad, 252 Mo. 438; Chicago, etc., R. Co. v. Schwyhart, 227 U. S. 184.]

We think the principles announced in the insurance cases and the removal cases are applicable here. If the record affirmatively shows that there was no excuse for injecting the name of the insurance company into the case, bad faith will be presumed. If the record shows that the insurance company is interested in the result, good faith is presumed. If it shows that there was good reason to believe that an insurance company was interested in the result, again good faith will be presumed. In any event, good or bad faith depends upon the question as to whether or not the questions on the *voir dire* concerning the insurance company were legitimate subjects of inquiry. It has nothing to do with the motive of an attorney who asks such questions in a proper case. To hold otherwise would mean that if two attorneys represented a plaintiff in a case where the defendant was insured, and one attorney harbored a fear that a biased juror might get upon the panel, but had no thought of what the effect would be upon disinterested jurors if they learned

of the interest of the insurance company, but the other attorney did not entertain any serious apprehension that a biased juror would be chosen, but was anxious that all the jurors know the interest of the insurance company in the case, then the question as to whether or not error was committed by asking the jurors whether or not they had any connection with the insurance company would depend upon which attorney asked the question.

We think the rule that we have announced is the only one which will bring the decisions in this State into harmony. In Maurizi v. Western Coal & Mining Co., 11 S. W. (2d) 268, the Supreme Court said that if the members of the panel were examined as to their relations to an insurance company, a further inquiry as to their connection with any number of insurance companies could not prejudice defendant. In Boten v. Sheffield Ice Co., 166 S. W. 883, this court approved a decision that held it was not error to permit plaintiff to ask each juror separately concerning his relations with the insurance company instead of requiring that the one question be put generally to the whole panel. In Malone v. Small, 291 S. W. 163, the St. Louis Court of Appeals passed directly upon this question. It held that no reversible error was committed by refusing to compel plaintiff's counsel to ask the jury collectively, rather than individually, as to their relationship and connection with an insurance company with which defendant carried liability insurance. In the case of Schuler v. St. Louis Can Co., 18 S. W. (2d) 42, the examination on the *voir dire* was as follows:

"I will ask you gentlemen, whether or not any of you do business with T. H. Mastin & Company?

"Gentlemen, I asked you a question whether or not any of you have any connection with T. H. Mastin & Company?

"Do you know Mr. Simpson, an adjuster for that company; or Mr. R. H. Davis, an adjuster for that company, either of those men?

"Any of you policyholders in that company?

"I will ask you, to make it clear, if you know T. H. Mastin & Co., attorneys in fact for the underwriters of an insurance company whose home office is in Kansas City, and whose agency is the Commonwealth Insurance Agency in the Pierce building, located across the street in the city of St. Louis, Missouri; do you know any of those people.?"

The Supreme Court held that plaintiff had a right to ask these questions because plaintiff had been informed that T. H. Mastin and Company had an interest in the case. The court further said: "Nor, in our opinion, does the record show any improper or prejudicial remarks on the part of the plaintiff's counsel, either in his interrogation of the jury panel along this line, or in his reply to the charge of bad faith made by defendant's counsel in the presence and hear-

ing of the jury." In the case of Cazzell v. Shofield, 8 S. W. (2d) 580, the prospective jurors were asked if any of them were stock-holders in Fort Wayne Medical Protective Association. Plaintiff then asked one juror *if he sold insurance* for a while to which he answered: "Yes." He also asked if any of the jurors had been engaged in selling insurance. The Supreme Court held that no error was committed. In Bishop v. Musick Plating Works, 3 S. W. (2d) 256, it was developed on the *voir dire* that defendant was insured. During cross-examination and in the arguments mention was made of the Maryland Casualty Company which had been mentioned on the *voir dire*. It was held that the jury could not have been prejudiced by being informed of a fact during the course of the trial which they already knew.

We have mentioned these cases because they illustrate the doctrine that whenever it is legitimate to reveal the fact that an insurance company is interested in the result of the trial, then the charge of bad faith will be rejected, although more was said about the insurance company than was absolutely necessary to determine the qualifications of the jurors. Plaintiff must bear the burden of his reckless conduct if he injects the name of an insurance company into a case where that is wholly unnecessary to obtain all the information to which he is entitled; but if the nature of the case is such that plaintiff has a right to inform the jury that an insurance company is interested in the result, then the courts will not hold that the examination was in bad faith, even though the plaintiff's attorney did not exercise caution to say no more about the matter than was absolutely necessary; because that caution would not result in any protection to the defendant.

If it be true that the fact that defendant was insured would not have been revealed at all had the plaintiff's attorney not indulged in unnecessary statements, then error was committed. We think that any juror with any information whatsoever would understand that Casualty Reciprocal Exchange was an insurance company. It is most ridiculous to assume that that name implies that that company was organized for the purpose of exchanging casualties. No juror would ever believe that any company or association was formed for the purpose of inflicting mutual injuries upon its members. The word "casualty" is so apt a word to describe an insurance company engaged in casualty insurance that the courts have taken judicial notice thereof. In the cases of Bishop v. Musick Plating Works, 3 S. W. (2d) 256; Plannett v. McFall, 284 S. W. 851; Craven v. Halpin-Boyle Const. Co., 15 S. W. (2d) 853, the jurors were asked concerning their connection with the Maryland Casualty Company. In each case the court passed upon the question as to whether or not it was proper to inject the name of an insurance company into

the case, without regard to the fact that the word insurance was not used. Furthermore, the plaintiff was entitled to ask if the prospective jurors carried insurance in the company; because in a company where the members insure themselves each member is to some extent interested in the result of the trial. [Craven v. Halpin-Boyle Const. Co., 15 S. W. (2d) 853.] Telling the jury that the Casualty Reciprocal Exchange was a mutual company did not add any information. It indicated that the company was incorporated under one article of the statute rather than under another. So it appears that the only thing that plaintiff's attorney did which would unnecessarily indicate that insurance was involved was to state that Bruce Dodson was in the insurance business. What was said by the Supreme Court in Schuler v. St. Louis Can Co., supra, prevents us from reversing the case on that account.

The claim that the verdict is excessive cannot be sustained. The evidence does not indicate that plaintiff received a serious injury; but on the other hand the jury returned a modest verdict for $1750. There is some evidence to the effect that he is permanently injured. He was put to some expense for medical treatment, his back was strapped up for two or three weeks, and he has lost about fifty or sixty days' time. The judgment should be affirmed. This commissioner so recommends. *Boyer, C.*, concurs.

PER CURIAM:—The foregoing opinion by BARNETT, C., is adopted by the court. The judgment is affirmed. *Bland* and *Arnold, JJ.*, concur; *Trimble, P. J.*, absent.