ROSIE CERVILLO, RESPONDENT, v. MANHATTAN OIL COMPANY ET AL., APPELLANTS.—49 S. W. (2d) 183.

Kansas City Court of Appeals. April 4, 1932.

*Frank Benanti* and *Julius C. Shapiro* for respondent.

*Hogsett, Smith, Murray & Trippe* for appellants.

BOYER, C.—Plaintiff sued the Manhattan Oil Company, its successor company, and Henry Snapp to recover damages for the death of her minor son who was run over by one of the wheels of the defendant company's truck then operated by its employee, Henry Snapp. The petition contains general and specific charges of negligence and alleges a right of recovery under the humanitarian rule. The answer was a general denial and a plea that the death was caused by the sole negligence of the deceased who, knowing of the presence of the truck, negligently undertook to mount the same or to go so close thereto as to cause his injury, all of which was without any

negligence on the part of defendants and without their knowledge. The case was submitted to the jury and recovery authorized under the humanitarian theory only. The verdict was for plaintiff and defendants duly appealed. The errors assigned are numerous. They will be considered separately, and the pertinent portions of the pleadings and facts will be shown in a consideration of the points.

Facts not in dispute: On January 9, 1929, Joe Ditta, a child then past nine years of age, met his death. He was the son of plaintiff, the sole surviving parent, and this suit was filed on the following 16th day of January. Forest Avenue and Pacific Street were two public thoroughfares in Kansas City; Forest Avenue extended north and south and Pacific Street east and west. Pacific Street did not extend directly across Forest Avenue, but where it entered from the west there was a jog of about fifty-four feet to the north, at which place it was extended to the east. The scene of the tragedy was near the middle of the intersection of these two streets where Pacific Street enters Forest Avenue from the west. Between property lines Pacific Street was fifty feet wide and Forest Avenue sixty feet wide. The paved portion of Pacific Street was thirty feet wide and the paved portion of Forest Avenue was twenty-six feet wide. There was a manhole approximately in the center of the intersection; it was 13.2 feet east of the west curb line of Forest Avenue and fourteen feet south of the north curb line of Pacific Street. Forest Avenue approached Pacific Street from the north on an upward grade; the intersection was more nearly level.

On the day in question and about four o'clock P. M., defendant Snapp was the employee of defendant company and was driving its truck in Forest Avenue going south towards and over the intersection with Pacific Street. Joe Ditta and other children had been released from school nearby, and to the north and east of that place. The children came from the east on Pacific Street and Joe Ditta with others crossed to the west side of Forest Avenue north of the intersection of Pacific Street as it entered Forest Avenue from the west and were proceeding southwardly in the direction of their homes. Some of the children remained on the east side of Forest Avenue. There was snow on the ground and the street curbing was not plainly visible. The children were making and throwing snowballs. As the truck crossed the intersection of Pacific Street, going south, some part of it ran over the boy very near the center of the intersection of the streets, and the injury then received resulted in his death. Just prior to the accident, and at the time, the truck was moving at a rate of speed of not more than six or seven miles an hour, and while approaching the place of injury could have been

stopped within a distance of a few feet. There was no signal given by the driver as he approached, entered and crossed the intersection.

The controverted issues of fact arise over the location of the boy at the time the truck was approaching and entering the intersection; his position and movements prior to and at the time the truck entered and crossed the intersection; and whether defendant's driver saw or could have seen the boy in a position of peril in time to avert injury. The evidence for plaintiff tends to show that the boy was standing in the middle of the intersection near the manhole facing east when the truck was fifteen feet from him; that there was no horn sounded or signal given by the driver; that the truck moved straight toward the boy; that the right front wheel struck him and both wheels on the right side of the truck passed over him. The evidence of defendants is to the effect that the boy was not standing in the intersection of the street at all, and was not in front of the truck at any time while it was crossing the intersection, and that after the front end of the truck had passed position of the boy fifteen feet away, he ran toward the west side of the truck with his hands lifted as it was crossing the intersection and approached very near the truck in front of the rear wheel; that his feet slipped and he fell under it; that the driver was wholly unaware of the boy's proximity to the truck; did not and could not see him approaching it, and did not know that the boy had been injured until he had driven some distance beyond.

## Opinion.

The first point urged by counsel for appellants is that the trial court erred in refusing to grant a new trial on the ground of perjury or mistake committed by plaintiff's witnesses. The basis of this charge is founded on statements made by two of plaintiff's witnesses and their answers given to questions propounded to them and written down by a competent shorthand reporter some months after the accident and more than a year prior to the trial. These witnesses, at the trial, testified to a state of facts directly contrary to and in conflict with their statements previously given. The main issue of fact at the trial was whether the boy was standing in front of the truck and was run down by the right front wheel, or whether after the front end of the truck had passed the boy, he ran toward the side of the truck to grab a ride, slipped, and fell under the right rear wheel.

William Kissgen was one of plaintiff's witnesses. At the time of the accident he was fourteen years of age. In November of that year he stated to the shorthand reporter in answer to questions propounded by an investigator for defendants, in the office of the school he was then attending, that he did not see the accident at all; that he

was told about it by another boy; that he was going south on the sidewalk on the east side of Forest Avenue; that they were running and the other boy was looking towards the truck, but he wasn't paying any attention to it; that he had his back to it and did not see the accident and did not know how it happened. During the trial he testified that he saw the right front wheel of the truck strike the boy, and testified to various other facts about the location of the truck and the boy. On cross-examination he testified that he crossed Forest Avenue with the injured boy and walked on the west side thereof up to and across Pacific Street; that they walked south to the northwest corner where Pacific Street enters Forest Avenue, and then went across the street south. The boy who was injured remained back on the corner. He was asked about the answers given by him to the shorthand reporter and the investigator and said: "I told them what I am telling you." Numerous questions and answers contained in the transcript of the reporter were read to the witness. He denied that he had made the answers shown in the transcript and denied practically every question and answer which had been propounded and reported. He was asked what parts of the answers were wrong and said: "All wrong." He said, however, that he undertook to answer the questions truthfully in the office of the president of the school.

Plaintiff offered another witness, Marion Bonura, who at the time of the trial was twelve years of age and at the date of the accident was ten. He testified that he heard a scream, turned around, and saw the right front wheel of the truck run over Joe Ditta. The examination of this witness had been made in the same manner as that of William Kissgen and transcribed, and at that time he stated that he did not know how the accident happened; that he was walking ahead and had his back to it; that he did not know which wheel ran over the boy; that he just heard some one scream and then looked back and Joe was lying there. He admitted that he had given some of the answers to the reporter, but denied most of them. He was asked: "Q. Why didn't you tell these folks at the Woodland School you saw the right front wheel strike Joe? A. I hadn't been thinking about it until I come down because it was quite awhile afterwards." The place referred to was where he had been questioned and had given answers prior to the trial.

Defendant put in evidence the transcript of the questions asked the witnesses and answered by them and showed that the transcript had been prepared by an experienced court reporter and that the questions had been propounded by another and the answers taken in the office of the school where the witnesses were examined, and that the transcript was true and correct in every particular.

Counsel for appellants urge that perjury or mistake was committed; that there is no escape from the conclusion, and that the ruling of the court to the contrary was without evidence to support it and is subject to review. But that was not the exact question presented to the trial court. It was not the ground alleged in the motion for new trial. Referring to the motion, we find that one of the grounds alleged for new trial was "that perjury was committed by plaintiff's witnesses," naming them, and that the verdict was occasioned by said perjury. The question therefore that the trial court was called upon to decide was whether or not "perjury" had been committed, and not whether a "mistake" had occurred which influenced the verdict. The question sought to be presented and ruled here is plainly different from the question ruled upon by the trial court. If the question of mistake had been urged as well as perjury the result might have been different, and we cannot find that the trial court erred in holding there was no mistake in the testimony of the witnesses which contributed to the verdict because that question was not presented for decision. The question presented was that of perjury. In passing upon the motion the trial court necessarily ruled that the witnesses did not commit perjury. The judge became a trier of the fact upon that issue, and unless his conclusion is entirely without support of substantial evidence there can be no interference.

One of the highest prerogatives vested in any tribunal is that with which the trial court is clothed when called upon to interpose between a party litigant and an unjust verdict. This duty and responsibility is paramount to all others and the importance of it is magnified because of the fact that the ruling of the court is often final and conclusive. When such court rules upon any question committed to it by authority of section 1002, Revised Statutes 1929, only a sound judicial discretion is permitted in a discharge of the high duty that confronts the court. It is the use and not the abuse of discretion that is permissible. The question of whether perjury was committed when called to the attention of the trial court in a motion for new trial is not to be waived aside, as respondent contends, on the theory that questions of veracity are for the jury and that after verdict they must pass out of the case, and that the appellate court should not interfere if the verdict receives approval of the trial judge. That is not the proposition at all. When the motion for a new trial was filed and the question of perjury raised, a new process was then initiated which involved an inquiry of fact to be determined by the judge in the exercise of a sound discretion. The conclusion is not necessarily binding upon an appellate court. However, when the trial judge rules, it is presumed that such ruling is supported by evidence and to overturn such presumption the rec-

ord must disclose that the ruling is not supported by any substantial evidence. The test of authority for interference with such action under such circumstances is whether the decision of the trial court rests upon any reasonable foundation of fact. [Davis v. Queermann, 22 S. W. (2d) 58, 59.] Cases relied upon by appellants are to the same effect. They are: Scott v. Railway Co., 168 Mo. App. 527, 530, et seq.; Thompson v. B. Nugent & Bro. Dry Goods Co., 17 S. W. (2d) 596, 597; State ex rel. Piepmeier v. Camren, 41 S. W. (2d) 902, 904.

In the present situation we cannot say that the record is sufficient to show that the ruling is unsupported by substantial evidence and that it must be overturned for a failure of the trial court to use sound discretion. The trial judge occupied an exceptionally advantageous position in passing upon this question. He saw the witnesses; the demeanor, conduct, and appearance of all of them were under his observation. The witnesses who are said to have committed perjury were children. They denied almost all of the material statements previously made which were in conflict with their testimony on the witness stand. There was meager explanation of a variance so wide and important, but the judge may have found extenuation in the youth and surroundings of the children. There was some evidence to support the finding and conclusion that they did not intentionally give false testimony. Even though we might believe that the weight of the evidence is contrary to the conclusion of the trial court, yet we would be constrained to rule against appellants in the contention here made.

Plaintiff's Instruction 1 is assailed for many reasons, one of which is that it is broader than the petition; that it authorizes recovery on the theory that the boy *walked or ran into the side of the truck,* and that no such theory of liability was pleaded in the petition; and that the only theory of liability in the petition is that the truck was directed at and run over the child.

This contention necessitates a statement of the pertinent parts of the petition and of the instruction. In the initial charging part of the petition it is alleged that the truck "was carelessly and negligently driven, operated and controlled, so that the same was caused and permitted to be directed at, run upon, into, against and over plaintiff's infant son." Then follow specific charges of negligence concluding with that stating humanitarian negligence. This last allegation of specific negligence charges that defendants negligently failed to keep a vigilant lookout, failed to exercise the highest degree of care, failed to sound a warning, and "that although said defendant corporation, and said defendant Henry Snapp, its agent, servant and employee saw, or by the exercise of due and prompt care on their part could have seen plaintiff's son in a position of peril and

danger of being struck by or coming in contact with said automobile truck in time thereafter by the exercise of due care on the part of said defendants to have stopped said truck or slackened the speed thereof, or to have turned the same aside, and thereby diverted the course thereof, or to have sounded a signal or warning and thereby to have averted striking plaintiff's son, . . . but negligently failed to do any and all of said things."

The instruction is lengthy, purports to cover the entire case, and directs a verdict. Among other matters it required a finding that the child was in imminent danger of being struck by or coming in contract with the truck; that the child was oblivious to his danger "or ignorant of the presence of said truck" and require a finding that "the driver of said truck saw, or by the exercise of the highest degree of care could have seen, said child so walking or running on said Forest Avenue, if you so find, approaching the point of collision and in a position of imminent peril from said truck, if you so find and believe he was in such position of imminent peril, in time thereafter, by the exercise of the highest degree of care on the part of the driver of said truck, and by means of appliances at hand, and with reasonable safety to said truck, contents and occupants thereof, to have sounded a signal or warning and warned said child, if so, or to have stopped said truck, or to have slackened the speed thereof, or to have changed the course thereof, and thereby averted the collision with said child, if so, and if you find that the driver carelessly and negligently failed to do any one or all of said acts to avert and avoid said collision, if you so find, and if you find that as a direct result of such negligence and carelessness, if any, said child was struck by, walked or ran into said truck, if so, and was knocked down and run over thereby and killed," with other required findings, then the verdict must be for plaintiff.

In the introduction of evidence, plaintiff adopted and pursued the theory of liability on the ground that the boy was standing in the middle of the street in front of the truck as it approached, and oblivious to his danger, and that the driver of the truck, while approaching the point where the boy was standing, drove it directly at him and ran the front wheel of the truck over him. There is no suggestion or intimation in plaintiff's evidence that liability was predicated on any other theory. There was no pretense or suggestion in the evidence of any theory of liability on the ground that the boy, while approaching the side of the truck, walked or ran toward it ignorant of its presence and was thereby placed in a position of peril at a time when the driver saw or could have seen such situation in time to avoid injury. The theory of plaintiff thus adopted and pursued lends aid to an interpretation of the allegations of the

petition and to the reasonable intendments thereof. While the petition charges that "the boy was in a position of danger of being struck by or coming in contact with the truck," the only danger of contact which was alleged was the danger arising from the truck being directed at·and run over the child. We think clearly that defendant was not notified or called upon to defend against liability on the theory that peril arose because the boy, oblivious of danger or ignorant of the presence of the truck, *walked or ran into the side of it* at a time when defendant's driver either saw or could have seen peril arising from such situation in time to avoid injury. The instruction authorizing recovery on the theory that the boy *walked or ran into said truck* is broader that the petition and is clearly erroneous. The law is that an instruction must be within the purview both of the pleadings and the evidence. Authorities could be multiplied; one will do. [Degonia v. Railroad, 224 Mo. 564, 589.] The instruction gave plaintiff an undue advantage of which her counsel availed himself in argument shown in the record to this effect: "But even if he was run over by the back wheel, as his Honor instructed you, the danger alone is not in the contact with the front wheel, but if the boy ran into the side of that truck and was injured and killed, as his Honor instructed you, it is your duty under the law, and he tells you in the plainest language that can be uttered by man that if the boy ran into or came in contact with the side of that truck . . . then it is your duty to bring in a verdict for the plaintiff." The prejudicial nature of the instruction is thus clearly revealed. Counsel for respondent cite numerous cases in which they say that counterparts of the instruction have been approved. We find no such counterpart in any of said authorities and fail to find that they deal with the question of an instruction being broader than the petition. Respondent also cites and quotes at length from various cases in which the humanitarian rule is expounded, but in none of which do we find any justification for submitting a case to a jury on an instruction broadening the issues beyond the scope of the petition. Counsel also cite and refer to cases in which recovery was authorized where a child or person was injured by coming in contact with the side of a motor car, a sample of which is Hornbuckle v. McCarty, 295 Mo. 162, 243 S. W. 327. In that case there was evidence that a truck was unexpectedly turned from a street intersection to the left in the path of children who were oblivious of its presence, and the driver instead of looking laterally forward had turned his head to the right and was looking backward while he continued to drive the truck. The present case is distinguishable upon the facts. Occasion does not require nor does reasonable space permit a review of the many cases cited, and we content ourselves by saying that after examination we find none of them ruled upon issues, facts,

and trial theory similar to those presented in the case at bar. They do not support plaintiff's verdict because her petition did not present the issue on which recovery was urged.

The only evidence in the case that the boy walked or ran into the side of the truck was that furnished by defendant. The driver of the truck testified that when he entered Pacific Street the boy was standing on the sidewalk on the northwest corner. Another witness for defendant who was following the truck in an automobile testified that shortly prior to the injury, and while the truck was crossing Pacific Street, the boy was in the street about fifteen feet from the side of the truck and ran towards it with his hands raised and slipped and feel under the rear wheel. If such was the situation, there was no evidence that the driver of the truck saw or could have seen the boy approaching the truck in that manner. The driver was seated on the left side of an enclosed cab and immediately back of him was a large oil tank on the truck. The front end of the truck had already passed the position of the boy at the time he started to run towards it. At that time and in that situation there was no duty resting upon the driver to look backward in order to observe the actions and conduct of any one who might be in the street, but it was his duty to look laterally ahead as was held in the Hornbuckle case, supra. It being his duty to look laterally ahead, it would be utterly unreasonable and absurd to contend that at the same instant it was also his duty to look laterally behind. The exercise of the highest degree of care has never yet attained that standard of efficiency. Therefore, there could be no basis for holding the driver negligent in failing to see the boy leave a place of complete safety and run toward the side of the truck after the driver had passed him.

Considering the aspect of the case here presented and upon which respondent claims a right of recovery, we may further observe that if the child walked or ran into the side of the truck there is no evidence that he was ignorant of the presence of the truck. The only evidence on that subject would indicate that he knew of the presence of the truck and was running toward it for the purpose of obtaining a ride. Neither do we think there was any duty on the part of the driver of the truck to sound a horn, slacken speed, change the course of the car, and stop the car, all after the front end of the truck had passed the boy standing in the street or on the sidewalk fifteen feet from the truck. Enough has been said to demonstrate that the giving of said instruction was reversible error.

Instruction P2 given at the instance of plaintiff is in these words:

''You are further instructed, gentlemen of the jury, in connection with Instruction No. P1, that even if you should find and believe from the evidence that plaintiff's deceased child was negligent in placing

himself in a position of imminent peril (if you so find he was), that such matter of contributory negligence is not an issue before you in connection with said instruction, and you are therefore instructed as a matter of law that if the deceased was contributorily negligent, at the time and place in question, such contributory negligence, if any, must not be regarded or considered by you as a defense in determining or considering the rights of plaintiff under Instruction No. P1 as given you herein.''

Appellants contend that the instruction is misleading and highly prejudicial because the concluding part of the instruction is equivalent to informing the jury that the negligence of the child in placing himself in peril must not be considered as a defense in determining the rights of plaintiff under Instruction 1, and that the meaning thereof is that ''in weighing the conduct of the driver the jury were told they must entirely disregard the conduct of the boy.'' It is argued that the conduct of the boy was an all-important factor in determining what the conduct of the driver should have been and in deciding the question of liability. This argument is based on the presumption that the boy stood on the sidewalk in safety until the front end of the truck passed him and then unexpectedly ran out into the street and negligently attempted to obtain a ride in a position where the driver could not possibly see him. In view of the manner in which the case was tried, and the ground upon which it was submitted to the jury, and the way in which this instruction is analyzed, there is reason and force in the argument presented. However, we are of opinion that the ordinary juror is not so keen an analyst and it is doubtful whether he would so reason about the instruction. It is likely that he would understand from the instruction that he should give no heed to the subject of contributory negligence because it was no defense to the case. But this is not entirely plain. Potential confusion and the power to mislead are contained in the instruction, and while we do not condemn it as containing reversible error, neither do we commend it for clarity. It is composed of a single sentence, unduly long, measurably involved, and fat with useless words. Respondent insists that no similar instruction has ever been condemned, but fails to cite us to any case where a similar one was approved. In behalf of the instruction it is insisted that it is clear that the court was instructing upon the fact that it was immaterial how imminent peril was created, and that contributory negligence is no defense in a last chance case. We think the instruction could be greatly improved, and if one is desired on the subject it would the well to draw another free from the fault that it might confuse or mislead.

We find no reversible error in plaintiff's Instruction 5 which submitted the measure of damages alone. Appellants insist that it erroneously authorized the jury to take into consideration the expectancy of life of the plaintiff without proper limitations, authorized a recovery for funeral expenses, and intimated to the jury that it might return a verdict for the sum of $10,000. Defendants failed to request any modifying or other instruction on the measure of damages. The plaintiff was before the jury as a witness, her age was shown, and the jury was entitled to consider her expectancy of life and judge of it from observation. Stevens v. Kansas City Light & Power Co., 200 Mo. App. 651, 208 S. W. 631, relied upon by appellants is not in point. The question there considered is different. There is evidence that plaintiff paid a part of the funeral bill. It was a proper subject for consideration. The instruction indicated that the verdict could not exceed the sum of $10,000, and that the court did not mean to instruct the jury to find for plaintiff in that or any other sum. Similar directions have at times been criticized and it has been held that the practice should be discontinued. [Bales v. K. C. Public Service Co., 40 S. W. (2d) 665, 669.] It is generally held that such direction does not constitute reversible error. In the present case the verdict was for about half of the maximum of recovery and it is not likely that defendants were prejudiced by the amount named in the instruction.

It is next contended that the court erred in refusing to discharge the jury on account of misconduct of counsel in asking a question designed to show that an insurance company was defending the case. The shorthand reporter who took the statements of plaintiff's witnesses prior to the trial was on the stand. She testified that she had accompanied an attorney to the school where the witnesses were examined, took down questions and answers, and transcribed them. The transcript was identified and offered in evidence. On cross-examination by plaintiff's counsel she was asked various questions about the attorney who accompanied her, his relationship to another, and by whom they were employed, a part of which is the following: "Q. With whom is he associated? A. Mr. Hoiles. Q. Who is Mr. Hoiles? A. He is a lawyer. Q. What office are they in? A. Federal Reserve Bank Building, 1204. Q. Will you give me the name of the office by whom they are employed? A. It is known as the office of Mr. L. S. Hoiles. Q. Whom did you bill for this transscript? A. L. S. Hoiles. Q. Do you have a carbon of your bill? A. Yes, I have. I don't have it with me. Q. Don't you know as a matter of fact L. S. Hoiles is employed by the Employers Insurance Corporation?" An objection was made and sustained and defendants' counsel moved that the jury be discharged. Whereupon,

plaintiff's counsel said: "If your Honor please, Mr. Hoiles is an employee, and there isn't any controversy about it, of the Employers Assurance Corporation." The court said: "You can show who paid for it, but why did you ask the last question? A. Because as a matter of fact he is with the Employers Insurance Company." The court: "You had already shown that." Counsel: "The jury is entitled to know the nature of the employment." The motion to discharge the jury was overruled.

Preceding the trial, in the presence of the court and out of hearing of the jury, it was admitted that the Employers Liability Assurance Corporation was the insurer and that Mr. Hoiles and his associate were its representatives in investigating the case. The examination on the *voir dire* is not given, but it appears to be conceded that the members of the panel were asked whether any of them were stockholders or employees of the Employers Liability Assurance Corporation. The objection here made is not directed to an improper examination on *voir dire,* but to an inexcusable injunction of the subject of an insurance company in the examination of the witness on the stand. We think the objectionable question was wholly unjustified and that it could have no other than a prejudicial effect. There was no proper purpose or motive back of it and no conceivable reason for it other than to give the jury an intimation that an insurance company was interested in the defense of the case. This is shown by the statement of plaintiff's counsel in the presence of the jury, and after objection to the question had been sustained, that Mr. Hoiles was an employee of the Employers Assurance Corporation, and that there wasn't any controversy about it. The Employers Insurance Corporation as a matter of fact was not the insurer, although of similar name. It is not reasonable to conclude that the object and purpose of the question was to discredit the testimony of the witness on the stand on account of the interest arising from her employment by Mr. Hoiles. This is the ground upon which respondent seeks justification and it is not sound. The obvious purpose was to impress the jury with the idea that an insurance company was the interested party on the side of the defendants. Even if the jury had been informed during the *voir dire* that an insurance company was defending, that would not justify a reiteration of the fact through the medium of improper questions and statements of counsel during the trial. The question was highly improper, the trial court so indicated and instructed the jury to disregard it, but as a matter of common knowledge we know that such instruction is wholly ineffectual to repair the damage. Episodes of this character are detrimental to the cause of a fair trial, the inestimable privilege of both sides. This last occurrence, fortified in evil effect by constant bickering and lack of decorum indulged throughout the

case, as disclosed by the record, ought to be sufficient to require a reversal of the judgment. [Nolen v. Halpin-Dwyer Const. Co., 29 S. W. (2d) 215, 219; Edwards v. Smith, 286 S. W. 428; Miller v. Harrison Const. Co., 298 S. W. 259.]

We have examined the remainder of the assignments of error and have not found that any of them are of sufficient importance or of the quality to be designated prejudicial. They pertain to the introduction in evidence of parts of the deposition of defendant Snapp as admissions against interest; the exclusion of certain statements of Marion Bonura; to the privilege of cross-examination of one of plaintiff's witnesses; to the introduction in evidence of the photograph of the deceased boy; to the exclusion of the statement of one of defendants' witnesses that "the boy was apparently going to climb on the truck;" and that the verdict is excessive.

We do not deem it necessary to enter a detailed discussion of these separate points. We have examined them and find that under the attending circumstances as shown by the record, and in view of the discretion of the trial court in his superintending control, there is no error in any of them materially affecting the merits of the case.

Upon a consideration of the whole record, evidencing a stormy and indecorous trial, and the errors committed, we are convinced that the interest of justice can be best served only by a reversal of the judgment and by remanding the case for a new trial. The Commissioner therefore recommends that the judgment be reversed and the case remanded. *Campbell, C.,* concurs.

TRIMBLE, P. J.—My view is that the opinion written by BOYER, C., should be adopted as the opinion of the court and the judgment reversed and the cause remanded for a new trial, accordingly. Judge BLAND does not agree with the reason assigned in the opinion, but, in effect, concurs in the result reached since he is of the opinion that plaintiff's instruction No. 1 was erroneous in submitting the question of the claimed negligence of the truck driver in not "slackening the speed of the truck" when there is no evidence tending to show that such slackening of speed would have prevented or averted the tragedy in any way. Consequently, the case will have to be retried, and when it is, doubtless the criticisms leveled against the method of trial from any authoritative source will be carefully avoided or the ground of such criticism obviated.

There are a number of specifications of negligence in the petition, but, as pointed out in Judge BOYER's opinion, the case was submitted on only *one,* the alleged violation of the humanitarian rule. The specifications not mentioned here are not such as affect in any way the question of whether the petition is broad enough to support

the charge of negligence in violating the humanitarian rule in the particular manner contained within the evidence adduced.

All the allegations of the petition which bear upon the *pleaded* violation of the humanitarian rule are as follows:

After alleging the status and relationship of the parties, the fact that the injured deceased was nine years of age, was on the public thoroughfare of Kansas City at and near the intersection of Forest Avenue with Pacific Street, the petition set up that Henry Snapp was an employee of defendant as a driver of one of its trucks; and that at said time and place "an automobile truck belonging to said defendant corporation, and being driven . . . in the business . . . . of said defendant corporation, by said defendant Henry Snapp, as its . . . employee as aforesaid, and while engaged in the scope of his said employment, in a southerly direction on said Forest Avenue, was carelessly and negligently driven, operated and controlled, so that the same was caused and permitted to be directed at, run upon, into, against and over plaintiff's infant son."

That defendant was careless and negligent in that it provided a truck so constructed as to obstruct the view of said driver and prevented him from maintaining a vigilant lookout, and negligently ordered said driver to drive said truck in said dangerous condition; that he negligently operated it in that condition, well knowing he could not maintain a lookout; that "said defendants were further careless and negligent, in this, to-wit: that they negligently and carelessly failed to keep a vigilant lookout for plaintiff's infant son and others upon said streets; that they carelessly and negligently failed to operate the truck as close to the right hand side of the street as was practical; that they negligently and carelessly failed to exercise the highest degree of care in operating said automobile truck as required by the laws of the State of Missouri, so as not to injure another; that they carelessly and negligently failed to sound any signal or give any warning of an approach of said truck to plaintiff's deceased son;"

That "although said defendant corporation, and said defendant Henry Snapp, its agent, servant and employee saw, or by the exercise of due and prompt care on their part could have seen plaintiff's son in a position of peril and danger of being struck by or coming in contract with said automobile truck in time thereafter by the exercise of due care on the part of said defendants to have stopped said truck or slakened the speed thereof, or to have turned the same aside, and thereby diverted the course thereof, or to have sounded a signal or warning and thereby to have averted striking plaintiff's son, by the means at hand and with safety to said truck, contents and occupants thereof,

but they carelessly and negligently failed to do any and all of said things to avert and avoid said injuries to said plaintiff's son."

That "the negligence of both defendants as aforesaid at said time and place were gross and aggravating; that they concurred and cooperated jointly and also severally to cause and occasion fatal injuries to plaintiff's son, and directly and proximately caused thereby the death of said plaintiff's infant son, Joe Ditta; that by reason of the premises aforesaid, and of the facts, matters and things herein set forth, said plaintiff has been damaged, and said defendants have become and are indebted and liable to said plaintiff Rosie Cervillo in the sum of ten thousand ($10,000) dollars, as actual and exemplary damages, as in such cases made and provided by law, particularly section 4219, Revised Statutes of Missouri, 1929."

Defendants' answer was a general denial together with a plea— "that said injury and death was caused by the sole negligence of the said deceased, who, seeing and knowing of the presence of said defendants' truck, negligently undertook to mount the same or to get so close thereto as to cause his injury, all of which was without any negligence on the part of these defendants and without their knowledge."

No reply was filed, but, as the case was tried as if one were filed, this is of no moment.

Now, in all of the above allegations of the petition, where is there any room or reason for supposing that the *situation of the parties* at the time of the alleged violation of the humanitarian rule was any place other than where the petition placed them, namely, the boy in the street ahead or in front of the truck, which was going in a southerly direction on Forest Avenue, and the operator thereof driving so as to permit the truck "to *be directed at, run upon,* into, against and over plaintiff's son" and carelessly "failed to keep a vigilant lookout for plaintiff's son" and negligently "failed to operate the truck as close to the right hand side of the street a was practical," and negligently "failed to exercise the highest degree of care in operating said automobile truck" and negligently "failed to sound any *signal* or give any *warning of an approach of said truck* to plaintiff's deceased son" and "although said defendant corporation, and said defendant Henry Snapp, its . . . employee, *saw,* or by the exercise of due and prompt care on their part *could have seen* plaintiff's son *in a position of peril* and danger of being struck by . . . said . . . truck, *in time thereafter* by the exercise of due care . . . to have *stopped* said truck, or *slackened the speed* thereof, or to *have turned the same aside* and thereby *diverted the course thereof,* or to have *sounded a signal or warning* and thereby . . . *averted striking* plaintiff's son . . . but . . .

1106

negligently failed to do any and all of said things," etc.? (Italics mine.)

Reading the above, no one would ever suspect that what plaintiff would *really claim* in the evidence would be that the boy was at one side of the street and, as the truck was passing, he *ran toward the side of the truck* in an attempt to climb on and catch a ride. There is not an intimation of such an idea or situation anywhere in the petition. And the situation presented in the latter picture is so entirely different from that in the former, that, not only would new and entirely different proof be required, but the evidence would have to be of a *peculiarly specific* and *definite* character as to the driver's *knowledge* of what the boy's *intention* was, and as to the driver's opportunity to avert the tragedy *after* the boy's danger became, or should have been, apparent, *before any case whatever* could be presented under a violation of the humanitarian rule, in a situation where the circumstances were like those of the one just stated. One witness said the boy ran toward the side of the truck and put up his arms as if to climb on the truck. But *when* did the boy's intention become manifest? No one says; but the inference would be that the boy did not raise his arms, and thus disclose his intention, until he was close to the truck, and then he was not within the range of the driver's vision. That is the way it would naturally occur; for, in running, the boy would not raise his arms until he was close to where he expected to climb and where a raising of the arms would be necessary or of any avail. Even if it could be said that the driver must, in the midst of his manifold and primary duties to watch and observe everything ahead or in front of him, also keep an eye to the side of the street and observe the boy, still he is not required to have that *omniscience* which would reveal to him what a boy nine years of age intends, or will attempt, to do one instant from the next. It might be possible for a driver, under the circumstances here considered, to violate the humanitarian rule, but it would be because he had *knowledge* of what was about to occur; and no *mere theory* that he ought to have known or that it was his duty to be on the alert and ascertain the situation, will be sufficient to make a case under such circumstances.

But, without regard to this phase of the case, the more important feature is that the petition does not *plead* a violation of the humanitarian rule under those circumstances, but manifestly places the boy in the street in front of or ahead of the truck, at which point he was in a place of danger so long as the truck continued on its way toward him and he did not see his danger nor move out of the way. Under these circumstances, the duty of the driver is manifest and if he did not see or observe the danger it was his duty to do so; and

also he could obviate the danger in various ways. But, under the other situation, *when* did the boy come into a place of danger? And when would that become manifest to the driver or should have become so? Moreover, what could he do to avert it? Slowing up would not do it; swerving to one side would not; indeed it might cause the boy to miss his intended hold and fall on that account. The very fact that the petition charges that the driver negligently failed to swerve to one side shows that the pleaded charge necessarily put the boy in front of the truck and not coming toward it from the side intending to catch a ride.

The *petition* in this case clearly pleaded a violation of the humanitarian rule under the one situation so clearly expressed. The *evidence attempted to present, and instruction No. 1 clearly submitted,* a violation of the rule under an entirely different situation. It is well settled that this cannot be permitted.

Going back to the feature of whether the driver could see, or could have seen, the boy as he ran to the truck, it is said that the opinion errs in holding, in effect, that the jury were bound to believe defendants' witnesses Snapp and Russell when they said the driver could not see the boy as he ran toward the truck. But, there is *no* evidence that he *did* see him, nor there is any showing, under the situation discussed, that he was under any *duty to see him.* Hence, it is not a question whether the jury were compelled to believe the two witnesses who say the driver did not see him, but the trouble is that there was *an entire absence* of any evidence to show that the driver saw him or should have seen him. Judge BOYER's opinion should be adopted as the opinion of the court, and the judgment should be reversed and the cause remanded.

BLAND, J.—This is a suit against the Manhattan Oil Company, its successor and one Henry Snapp, to recover damages for the death of plaintiff's minor son, Joe Ditta, who was run over by the truck of the defendant, Manhattan Oil Company, being operated at the time by its employee, Snapp. There was a verdict and judgment in favor of plaintiff in the sum of $5,365 and defendants have appealed.

The facts show that Joe Ditta nine years of age, was killed at the intersection of Pacific Street and Forest Avenue, in Kansas City; that Forest Avenue and Pacific Street are two public thoroughfares in said city; that Forest Avenue extends north and south and Pacific Street east and west; that Pacific Street does not extend directly across Forest Avenue to the east but where it enters from the west there is a jog about fifty-four feet to the north, at which place it extends to the east; that deceased was killed near the middle of the in-

tersection of these two streets where Pacific Street enters Forest Avenue from the west; that between property lines Pacific Street is fifty feet in width; that Forest Avenue is sixty feet wide; that the paved portion of Pacific Street is thirty feet in width and the paved portion of Forest Avenue is twenty-six feet wide; that there is a manhole approximately in the center of the intersection; that the manhole is 13.2 feet east of the west curb line of Forest Avenue and fourteen feet south of the north curb line of Pacific Street; that Forest Avenue approaches Pacific Street from the north on an upward grade and at the intersection it is more nearly level.

About four o'clock P. M., of January 9, 1929, Snapp was driving the truck on Forest Avenue going south toward and over the intersection with Pacific Street. Joe Ditta and other children were on their ways home from a nearby school located to the north and east of said intersection. The children came from the east on Pacific Street and Joe Ditta, with others, crossed to the west side of Forest Avenue north to the intersection of Pacific Street as it enters Forest Avenue from the west. Joe Ditta and some of the children then crossed to the southwest corner of the intersection as they proceeded southwardly in the direction of their homes. Some of the children remained on the east side of Forest Avenue. There was snow on the ground and the street curbing was not plainly visible. The children were making and throwing snowballs. As the truck proceeded on over the intersection of Pacific Street going south it ran over deceased, who was about in the center of the intersection of the streets in question. Just prior to the collision and at that time the truck was moving at a rate of speed of not more than six or seven miles per hour and, while approaching the place of injury, could have been stopped within a distance of a very few feet. No signal was given by the driver as he approached, entered and crossed the intersection.

The main controversy at the trial was over the location of the boy at the time the truck was approaching and entering the intersection, his position and movements prior to and at the time the truck entered and crossed the intersection and whether the driver of the truck saw or could have seen deceased, in a position of peril, in time to have averted injuring him.

The evidence on behalf of plaintiff tends to show that deceased was standing in the middle of the intersection near the manhole, facing east when the truck was fifteen feet from him; that there was no horn sounded or signal given by the driver; that the truck moved straight toward the boy; that the right front wheel of the truck struck him and both wheels on the right side of the truck passed over his body.

The evidence of the defendants, taken in its most favorable light to them, is to the effect that the boy was not standing in the intersection and was not in front of the truck at any time while it was crossing the intersection but that, after the front end of the truck had passed the position of the boy fifteen feet away, he ran toward the west side of the truck with his hands lifted as it was crossing the intersection and approached very near the truck in front of the right rear wheel; that his feet slipped and he fell under it; that the driver of the truck was wholly unaware of deceased's proximity to the truck; that he did not and could not see him approaching, and did not know that deceased had been injured until he had driven some distance beyond.

The point urged by the defendants is that the trial court erred in refusing to grant a new trial on the ground of perjury or mistake committed by plaintiff's witnesses. In this connection the facts show that the Manhattan Oil Company carried liability insurance and that the insurance company, shortly after the casualty, sent an attorney and a skilled shorthand reporter to a school in the vicinity of the collision; that the attorney propounded the questions and the witnesses, who were children, made answers thereto and that the testimony was afterwards transcribed by the reporter. However, this testimony was never signed by the witnesses, nor was the plaintiff represented at the time of the taking of the testimony. The basis of this charge of error is founded on statements made by two of these witnesses, who testified for plaintiff. These witnesses at the trial testified to a state of facts directly contrary to and in conflict with their statements as contained in the transcript of their testimony made by the shorthand reporter. At the trial these witnesses testified to the effect that they saw the truck run over deceased, who was directly in front of it. But the transcript of their testimony taken by the insurance company shows that they stated at the time that they were examined at the school house that they did not see the happening.

One of the witnesses in question was William Kissgen. At the time of the collision he was fourteen years of age. He stated at the school examination, according to the transcript, that he did not see the accident; that he was told about it by another boy; that he did not know how it happened. During the trial he testified that he saw the right front wheel of the truck strike deceased, and to various other facts as to the location of the truck and the deceased. He was asked about the answers given by him at the school house and he said: "I told them what I am telling you." A number of the questions and answers contained in the transcript of the reporter were read to the witness and he denied that he had made the answers shown in the transcript. He denied practically every ques-

tion which the transcript showed had been propounded and reported. He stated that the answers "were all wrong." He said, however, that he undertook to answer the questions truthfully while in the office of the principal of the school.

Another of these witnesses was Marion Bonura, who at the time of the trial, was twelve years of age and on the date of the collision ten years of age. The transcript of his testimony shows that he stated at the school house examination that he did not see the collision and did not know how it happened. But at the trial he testified that he heard a scream, turned around and saw the right front wheel of the truck run over deceased. He admitted that he had given some of the answers at the school house but denied most of them. He was asked: "Q. Why didn't you tell these folks at the Woodland School you saw the right front wheel strike Joe? A. I hadn't been thinking about it until I come down because it was quite awhile afterwards."

Defendants' evidence tends to show that the transcript properly reported the testimony of the children taken at the school house. While defendants urge that perjury or mistake was committed, the motion for a new trial was founded upon perjury. The question, therefore, is whether or not we are in a position to disagree with the trial court in holding that the verdict was not procured through perjury. We find nothing about the case, other than the usual conflict that often appears in cases of this kind between extra judicial statements of witnesses and their testimony at the trial, and are not justified in interfering with the trial court's ruling upon the matter. [Davis v. Quermann, 22 S. W. (2d) 58, 59; Scott v. St. Jos. Ry. L. H. & P. Co., 168 Mo. App. 527, 530; Thompson v. Nugent Bros. Dry Goods Co., 17 S. W. (2d) 596, 597; State ex rel. v. Carmen, 41 S. W. (2d) 902, 904.]

It is insisted that the court erred in giving plaintiff's instruction No. 1. The instruction is lengthy, purports to cover the entire case, and directs a verdict. Among other matters it required a finding that the child was in imminent danger of being struck by or coming in contact with the truck; that the child was oblivious to his danger "or ignorant of the presence of said truck" and required a finding that" the driver of said truck saw, or by the exercise of the highest degree of care could have seen, said child so walking or running on said Forest Avenue, if you so find, approaching the point of collision and in a position of imminent peril from said truck, if you so find and believe he was in such position of imminent peril, in time thereafter, by the exercise of the highest degree of care on the part of the driver of said truck, and by means of appliances at hand, and with reasonable safety to said truck, contents and occupant thereof, to have sounded a signal or warning and warned said child, if so, or to have

stopped said truck, or to have slackened the speed thereof, or to have changed the course thereof, and thereby averted the collision with said child, if so, and if you find that the driver carelessly and negligently failed to do any one or all of said acts to avert and avoid said collision, if you so find, and if you find that as a direct result of such negligence and carelessness, if any, said child was struck by, walked or ran into said truck, if so, and was knocked down and run over thereby and killed," with other required findings, then your verdict must be for plaintiff.

It is insisted that the instruction is broader than the petition; that it authorizes a recovery on the theory that the boy walked or ran into the side of the truck; that such a theory of liability was not pleaded in the petition; that the only theory of liability in the petition is that the boy was in front of the truck when it ran over him.

The petition first contains a general charge of negligence, that is, that the truck was "carelessly and negligently driven, operated and controlled, so that the same was caused and permitted to be directed at, run upon, into, against and over plaintiff's son." Then follows certain specific charges of negligence, concluding with that stating negligence under the humanitarian rule. This last allegation of negligence is as follows:

"That, although said defendant corporation, and said defendant Henry Snapp, its agent, servant and employee saw, or by the exercise of due and prompt care on their part could have seen plaintiff's son in a position of peril and danger of being struck by or coming in contact with said automobile truck in time thereafter by the exercise of due care on the part of said defendants to have stopped said truck or slackened the speed thereof, or to have turned the same aside, and thereby diverted the course thereof, or to have sounded a signal or warning and thereby to have averted striking plaintiff's son, by the means at hand and with safety to said truck, contents and occupants thereof, but they carelessly and negligently failed to do any and all of said things to avert and avoid said injuries to said plaintiff's son."

The evidence of plaintiff all shows that deceased was standing in the middle of the street in front of the truck as it approached; that he was oblivious of his danger and that the driver of the truck, while approaching the point where the boy was standing, drove it directly at him and ran the front wheel of the truck over him. Of course, there was no evidence on the part of the plaintiff that deceased, while approaching the side of the truck, walked or ran into it and was injured by falling under the right rear wheel. However, the petition, in no place, alleges that deceased was in front of the truck at any time. The charge that the truck was permitted to be "directed at, run upon, into, against and over plaintiff's son," is most general.

Evidently it was the intention of the pleader to make this charge as to the manner in which the truck ran over deceased general enough to take care of any variations that the evidence might take as to this matter. However that may be, the case was submitted solely upon the humanitarian rule and all other charges of negligence in the petition, outside of that based upon that theory, were abandoned and need not be considered. It is quite apparent from the charge of humanitarian negligence that plaintiff did not confine the position of her son to any specific location, but makes the allegation that he was in a position of peril and in danger of being struck by *"or coming in contact with"* the truck. (Italics ours.) It means to us that it is quite apparent that the allegations of the petition were broad enough to submit a humanitarian case based upon the theory that deceased ran into the side of the truck. There is no question but that there was sufficient evidence for the jury's consideration to establish a case under the humanitarian doctrine upon the theory that the child was run over by coming to its side and falling under the right rear wheel thereof.

If the testimony of defendants' witnesses, Snapp and Russell, is to be believed the driver of the truck could not have seen deceased running toward the truck. But the jury was not bound to take the testimony of these witnesses as true and were at liberty to believe only that part of it as was favorable to plaintiff. The jury is not bound to believe the testimony of the witness, Snapp, that he looked a second time and saw deceased as he passed him, at the northwest corner of Pacific Street and Forest where Pacific Street enters Forest Avenue from the west. He testified in his deposition that he did not again look to the right after he saw deceased when the truck was thirty or forty feet north of where deceased was standing on the sidewalk at the northwest corner of the intersection; that after seeing deceased when his truck was at that point he looked to the left and did not thereafter notice him. However, there are many inferences to be drawn from other testimony that deceased was not standing upon the sidewalk at the northwest corner of the streets in question at the time the front end of the truck passed that point as was testified to by the driver of the truck.

The testimony of the witness, Josephine Ditta, shows that she and her sister, followed by deceased, crossed over Pacific Street to the south side thereof. She testified that her sister, Annie, was behind her and that deceased "was behind us." She testified: "Q. Now, Joe never went across the street (Pacific Street, south) did he? A. Yes. Q. He did? A. He was behind us." This shows that deceased got to the southwest corner of the intersection. This was also testified to by the witness, William Kissgen. He said that he and deceased went south on the east side of Forest; that deceased crossed

over "on the southwest side," at which time *the truck was about fifty feet* away; that deceased "went back on the corner on the southwest side and went back on (toward) the east side" and that the truck ran over him in the street.

The jury could say from this testimony of the witnesses, Josephine Ditta and William Kissgen, that deceased went into the street from the southwest corner of the intersection. The evidence shows that he was struck near a manhole, which is 13.2 feet east of the west curb line of Forest Avenue extended across Pacific Street and about fifteen or sixteen feet north of the south curb line of Pacific Street extended eastwardly across Forest Avenue. In other words, in order to get to the place of the collision deceased must have gone north-easterly in a diagonal direction or otherwise and, of course, if this is true, he must have been in plain sight of the driver of the truck, who was headed south, had he looked laterally and ahead, while deceased was proceeding "in a slow trot" as he approached the point of collision. The jury was at liberty to find from all of the testimony that deceased was either in front of the truck and was run over by the front right wheel of the truck, as well as the rear wheel, or, believing defendants' testimony that he ran in a trot toward the center of the truck for the purpose of attempting to board it for a ride, that he ran to the truck and slipped and was run over by the rear wheel only. Of course, the jury could say that it was the duty of the driver of the truck to have taken whatever measures there were at his command to stop the truck when he saw or should have seen deceased, who was a child but nine years of age, trotting toward the truck. [Livingston v. Ry., 170 Mo. 452; Holmes v. Rd., 207 Mo. 149; Llywelyn v. Lowe, 239 S. W. 535; Erxleben v. Kaster, 21 S. W. (2d) 195, 198; Carney v. Ry., 23 S. W. (2d) 993, 1001; Messer v. Gentry, 290 S. W. 1014, 1016.] We apprehend that no court would say that a driver of a truck, or other vehicle, seeing a child nine years of age trotting toward it, would be under no obligation to anticipate trouble and to take measures at his command to avoid it. As was said in Mann v. Ry., 100 S. W. 566, 567:

"The conduct of a boy twelve years old should not be measured by the standard of care applied to an adult, because the immaturity of youth ordinarily embraces, not only an imperfect knowledge of natural facts and laws and of the proper relation between cause and effect, but, when possessed of those elements necessary to the exercise of reasonable care, it still lacks the discretion, thoughtfulness and judgment presumed to be an attribute of the ordinarily prudent adult, and which may be said to come only with experience. Thoughtlessness, impulsiveness, and indifference to all but patent and imminent dangers are natural traits of childhood, and must be taken into account when we come to classify the conduct of the child."

As before stated, if there is testimony tending to show deceased left the southwest corner of the intersection when he went to the point in the street, where he was run over, then it makes no difference how many other witntesses testified, if they did, that he left the sidewalk or started toward the truck from some other place. We, therefore, are not concerned with the testimony of defendants' witness, Russell. However, this witness testified that he was not in a very good position to see what occurred; that his testimony was more or less a guess. It is true that this witness testified that the front end of the truck was south of the boy when the boy came trotting, in the middle of the street, toward and at right angles with it. But the witness testified that he first saw deceased when the boy was fifteen feet west of the truck and that the child was then trotting toward the middle of the truck and, according to this witness, the child was still at the middle of the truck when he got up to it.

It is different to see how the child, when he got up to the truck, could be at the middle thereof when he was in the same position in reference to the center of the truck when he was fifteen feet away and approaching in a slow trot. We think that, very probably, the jury, even under this witness' testimony, taking it in its most favorable light to plaintiff, could have found that the driver of the truck could have seen deceased running toward it, for the reason that, if, when deceased reached the truck he was at the middle thereof, the truck must have been considerably further north when deceased was fifteen feet therefrom. In other words, the truck must have covered several feet during the time that deceased covered the fifteen feet in question. The evidence shows that the truck was about twenty feet in length. There are many photographs of the truck introduced in evidence and, viewing these photographs, which were before the jury, it would appear that the driver of the truck was stationed about half way between the front and the middle of the truck. If this is true he was seated about five feet forward of where deceased ran into the truck. It is reasonable to suppose that the truck traveled more than five feet, going at the rate of six or seven miles per hour, while deceased was covering fifteen feet in a *slow* trot. If deceased was making over four of five miles per hour he was actually *running* and not in a slow trot. Therefore it is reasonable to say that the truck was traveling faster than deceased and was further than fifteen feet away from the point of collision when deceased started toward it. At one place in this witness' testimony he stated that the truck was "just entering Pacific Street" when deceased was fifteen feet away proceeding east in the middle of the street.

However, we think it is apparent from all of the testimony that the jury was justified in saying that the driver of the truck saw or could have seen deceased approaching it in a slow trot, in time

to have stopped the truck, which under the evidence, could have been accomplished in less distance than four or five feet, for the reason that the driver of the truck stated that it would require only this amount of space if he did not put the brake on. The inference is plain that if he used the brake he could have stopped the truck in less distance or almost instantly.

Even if the driver of the truck did not have time to stop the truck, after he first saw or could have seen deceased running toward it, he, at least, could have sounded a warning. The Supreme Court in the case of Spindler v. Wells, 276 S. W. 377, 388, held that a warning should be given in some circumstances even when a person is aware of the approach of the vehicle that is about to strike him. The driver of the truck should have sounded a warning in order to have brought to the realization of deceased, who was but nine years of age, the danger of proceeding on toward the truck. The facts in this case disclose a situation where the rule of the highest or utmost degree of care should be applied with all its severity, as on the sidewalks on both sides of the street were many children and they were running back and forth across the street absorbed in play. The driver of the truck saw the situation and should have used a high degree of care, not only to keep his truck under control, but in looking for danger.

We think, however, that plaintiff's instruction No. 1 was erroneous in submitting to the jury the question of slackening the speed of the truck. It is left to mere speculation and guess whether this would have prevented deceased from coming in contact with and/or slipping under the truck in such a manner as to cause his death in the very way which happened in this instance. [See Schmidt v. Transit Co., 140 Mo. App. 182, 187.] Even if the speed of the truck had been slackened, no one could tell whether deceased would not have slipped a little bit more in advance of the rear wheel than he did, with the same consequences. Very probably this is also true of the submission of the failure to swerve the truck. We think it was proper to submit the question of obliviousness of deceased as to his danger, although he saw the truck coming and intended to catch a ride thereon. He was a child but nine years of age, and the jury could say that, lacking in discretion and judgment, he was ignorant of the full danger of running to the side of the truck intending to catch a ride, and that his youth would have been apparent to the driver had he looked. It was not error to submit the question of his obliviousness but it was error to submit his being ignorant of the presence of the truck in connection with submitting that he walked or ran into it. This suggested to the jury that there was evidence that deceased was ignorant of the presence of the truck but through some inadvertence ran into its side. The evidence relied upon by plaintiff in submitting that deceased ran to the side of the truck

shows that he ran face forward intending to board it. There is no evidence or inference from the evidence that, as deceased ran toward the truck, he did not run face forward, and of course, he must have seen the truck before he ran to it.

Criticism is made of plaintiff's Instruction P-2. Defendants contend that this instruction is misleading because the concluding part thereof is equivalent to informing the jury that the negligence of deceased in placing himself in peril must not be considered as a defense in determining the rights of plaintiff under Instruction 1. It is unnecessary to set out this instruction. It is merely on the question of contributory negligence and concludes by stating that the contributory negligence of deceased, if any, "must not be regarded or considered by you as a defense in determining or considering the rights of plaintiff under instruction P-1 as given you herein." The instruction could be so worded as to meet the contention of defendants by striking out all of it after the word, "defence." While we do not intend to say that the instruction constitutes prejudicial error in the wording in which it was given, it would be better for plaintiff to redraft the instruction at another trial by omitting the words suggested.

We find no reversible error in plaintiff's Instruction 5, which submitted the measure of damages, alone. Appellants insist that it erroneously authorized the jury to take into consideration the expectancy of life of the plaintiff without proper limitations, authorized a recovery for funeral expenses, and intimated to the jury that it might return a verdict for the sum of $10,000. Defendants failed to request any modifying or other instruction on the measure of damages. The plaintiff was before the jury as a witness, her age was shown, and the jury was entitled to consider her expectancy of life and judge of it from observation. Stevens v. Kansas City Light & Power Co., 200 Mo. App. 651, 208 S. W. 631, relied upon by appellants is not in point. The question there considered is different. There is evidence that plaintiff paid a part of the funeral bill. It was a proper subject for consideration. The instruction indicated that the verdict could not exceed the sum of $10,000, and that the court did not mean to instruct the jury to find for plaintiff in that or any other sum. Similar directions have at times been criticized and it has been held that the practice should be discontinued. [Bales v. K. C. Public Service Co., 40 S. W. (2d) 665, 669.] It is generally held that such direction does not constitute reversible error. In the present case the verdict was for about half of the maximum of recovery and it is not likely that defendants were prejudiced by the amount named in the instruction.

It is next insisted that the court terred in refusing to discharge the jury on account of the misconduct of counsel for plaintiff in ask-

ing a question designed to show that an insurance company was defending the case. The shorthand reporter, who took, prior to the trial, the statements of plaintiff's witnesses, was on the stand. She testified that she accompanied the attorney to the school where the witnesses were examined; that she took down the questions and answers and transcribed them. The transcript was identified and offered in evidence. On cross-examination by plaintiff's counsel she was asked various questions about the attorney who accompanied her, one of the questions propounded being: "Q. Don't you know, as a matter of fact, that L. S. Hoiles is employed by the Employers Assurance Corporation?" Objection was made and sustained. Defendants' counsel moved that the jury be discharged, whereupon, plaintiff's counsel said: "If your Honor please, Mr. Hoiles is an employee, and there isn't any controversy about it, of the Employers Assurance Company." The motion to discharge the jury was overruled.

The record discloses, by admission of counsel for defendants, that the defendant, Manhattan Oil Company, was insured and that Hoiles was the representative of the insurance company; that Clark, who went with Miss Arceneaux to the school house to take the testimony of the children, was an attorney for the insurance company. Neither Hoiles nor Clark were among defendants' attorneys at the trial. The record also shows, by inference, that Miss Arceneaux was paid by Hoiles, the representative of the insurance company, for her services. It is affirmatively shown that she sent her bill to Hoiles. It was therefore, proper to show his relationship with the insurance company. [See Snyder v. Elec. Mfg. Co., 284 Mo. 285; Jablonowsky v. Modern Cap Mfg. Co., 279 S. W. 89; Grindstaff v. Steel Co., 40 S. W. (2d) 702.]

We have examined the remainder of the assignments of error and have not found that any of them are of sufficient importance or of the quality to be designated prejudicial. They pertain to the instruction in evidence of parts of the deposition of defendant Snapp as admissions against interest; the exclusion of certain statements of Marion Bonura; to the privilege of cross-examination of one of plaintiff's witnesses; to the introduction of evidence of the photograph of the deceased boy; to the exclusion of the statement of one of defendants' witnesses that "the boy was apparently going to climb on the truck;" and that the verdict is excessive. We do not deem it necessary to enter a detailed discussion of these separate points.

On account of the error in the giving of plaintiff's instruction No. 1, the judgment is reversed and the cause remanded. *Arnold, J.,* concurs; *Trimble, P. J.,* concurs in the result.