RILEY M. POWER, RESPONDENT, v. JULIUS FRISCHER, APPELLANT.—
87 S. W. (2d) 692.

Kansas City Court of Appeals.   October 7, 1935.

*Schultz & DeMaria* for respondent.

*Langworthy, Spencer & Terrell* for appellant.

TRIMBLE, J.—An action for damages claimed by plaintiff to have arisen from a collision between the respective automobiles of the parties, occurring on the evening of April 6, 1932, at the intersection of Brookside Boulevard (whereon plaintiff was traveling north), with Fifty-fifth Street (whereon defendant was traveling east), in Kansas City, Missouri.

The petition alleged several acts of negligence such as dangerous and reckless rate of speed, a failure to keep a vigilant lookout ahead, a failure to sound any signal or warning of his approach, and finally, negligence based upon a violation of the so-called humanitarian, or last chance, rule couched in these words:

"(4) The defendant saw, or by the exercise of the highest degree of care could or might have seen and become aware of the existence of the plaintiff and his automobile in a position of imminent peril and danger in front of defendant's automobile, in time, thereafter, by the exercise of the highest degree of care, with the appliances then on said automobile and with safety to said automobile and the persons therein, to have stopped his said automobile, swerved the same to one side or slackened the speed thereof and thus have avoided colliding with plaintiff's automobile, but all of which defendant negligently and carelessly failed to do."

The petition further pleaded Section 52, Subdivision "A" of Ordinance No. 2031, of Kansas City, known as the Traffic Code, as follows:

"*Right of Way Between Vehicles.* (a) Vehicles Approaching an Intersection. The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection. When two vehicles enter an intersection at the same time, the driver of the vehicle on the left shall yield to the driver on the right."

The prayer was for judgment in the sum of $15,000. The answer contained first, a general denial, next, a counterclaim based upon the charge that while the defendant was, on the date mentioned, driving his automobile in an easterly direction near Fifty-fifth Street and Brookside Boulevard, an automobile driven by plaintiff, in a northerly direction on Brookside Boulevard, came into violent collision with defendant's car, and damaged it to the extent of $35.10; and plaintiff is liable therefor on the ground that plaintiff drove his car in a careless and negligent manner and did not exercise the highest degree of care as required by Section 7775, Revised Statutes of Missouri, 1929, 7 Mo. St. Ann., p. 5197.

The plaintiff's reply was a general denial. The case was duly assigned to Division No. 2 of the Circuit Court of Jackson County, presided over by HON. DARIUS A. BROWN. On the third day of April, 1934, at the March term, 1934, the plaintiff, at the close of the evidence in his behalf, by leave of court, amended his petition by striking out the words "in front of" in paragraph No. 4 hereinafter quoted, and inserting in their stead the words "or coming into a position of imminent peril of colliding with" so that the assignment of negligence, on which the case was submitted, then read as follows:

"(4) The defendant saw or by the exercise of the highest degree of care could or might have seen and become aware of the existence of the plaintiff and his automobile in a position of imminent peril and danger or coming into a position of imminent. peril of colliding with defendant's automobile, in time, thereafter, by the exercise of the highest degree of care, with the appliances then on said automobile and with safety to said automobile and the persons therein, to have stopped his said automobile, swerved the same to one side or slackened the speed thereof and thus have avoided colliding with plaintiff's automobile, but all of which defendant negligently and carelessly failed to do."

The plaintiff also, by leave of court, amended his petition, by erasure and interlineation, reducing the amount of damages prayed for from $15,000 to $7,500.

At the close of the trial, the jury returned, on the issues raised

by the petition, a verdict in plaintiff's favor, for $1,500 and also for plaintiff, on defendant's counterclaim.

Defendant's motion for new trial deals entirely with matters pertaining to the case on the petition and hence it appears that no appeal was taken from the judgment on defendant's counterclaim.

Defendant's first contention is that his demurrer at the close of the entire evidence should have been given.

A peremptory instruction to find for the defendant was asked at the close of the evidence in plaintiff's behalf, but as defendant did not stand thereon upon its being overruled, and introduced evidence in his behalf, that demurrer was waived and therefore it need not be further noticed.

It is well settled that if the evidence, when considered as a whole, is sufficient to present or make out a case for the jury, the peremptory instruction asked in behalf of defendant, should be refused. [Caldwell v. Wilson Stove Mfg. Co., 238 S. W. 415, 417.]

The case being submitted only on the violation of the humanitarian rule, the other grounds of negligence are abandoned. [Cervillo v. Manhattan Oil Co., 226 Mo. App. 1090, 49 S. W. (2d) 183.]

Does the evidence reveal a submissible case on a charge involving the violation of the humanitarian rule? To effect this result, the evidence must show: First, that plaintiff was in, or inevitably going into, a position of peril; second, that defendant had notice thereof, either actual or constructive, if it was his duty to be on the lookout; third, that defendant, after having such notice, had the present ability with the means at hand to avert the impending injury without danger to himself or others; fourth, failure to exercise ordinary care to do so; and fifth, plaintiff was thereby injured. [Banks v. Morris & Co., 302 Mo. 254, 267.] When evidence is shown tending to prove the above facts, a prima facie case is made for plaintiff. [Ziegelmeier v. East St. Louis, etc., Ry. Co., 51 S. W. (2d) 1027, 1029.]

The evidence in behalf of plaintiff tends to show:

Plaintiff testified that he was going north on Brookside Boulevard and as he approached the intersection at Fifty-fifth Street, the streets were wet and slippery from a "heavy drizzle." His car was "mechanically operating all right," his windshield wiper was working properly, and the lights on his car were in good condition. He could see with them "immediately ahead, I imagine, I could see 100 feet . . . anyway that." He could see probably twenty or twenty-five feet to the side. His left wheels were about the center of the street.

The front end of his car was about on a line with the south curb line of Fifty-fifth Street on the east side of Brookside Boulevard, and as he was "just entering the intersection," he saw defendant's

Cadillac car on Fifty-fifth Street to his left (or west), about ten or twelve feet west and perhaps fifteen or twenty feet north of him (Fifty-fifth Street is twenty-seven feet wide where it reaches Brookside Boulevard on its west boundary and at the latter's east boundary said Fifty-fifth Street is forty-two feet in width, that is to say, the south line of Fifty-fifth Street east of Brookside is fifteen feet further south than is said south line on the west of Brookside).

According to plaintiff's best judgment, defendant was traveling between ten and twelve miles per hour. When plaintiff saw defendant's car, he immediately "applied my brakes and swerved to the right to try to go east on Fifty-fifth." I saw he was not going fast and I thought I could go in front of him. He swerved his car to the right "just as far as the wheels would turn." When he did this, his car began skidding. Plaintiff testified his car continued to skid until it was at least ten feet further east than he was when he first began to skid, and when he reached said point ten feet further east, the collision occurred and plaintiff was injured as hereinafter stated. Plaintiff further testified that from the time he first saw the Cadillac (defendant's car), until the collision, it "kept its original course right on across Brookside" and did not swerve to the left at all. There was no traffic at all on the streets nor standing cars to prevent a swerving at that time; nor did the Cadillac car slow up or slacken its speed in any way. Nor was defendant's horn sounded before the impact.

Plaintiff further testified that as he approached Fifty-fifth Street he was not going over twenty-five miles an hour, possibly thirty miles an hour. He looked both ways up Fifty-fifth when he reached the south line of the said intersection and it was then that he saw defendant on Fifty-fifth coming east toward the intersection, but as defendant was traveling at a slow rate of speed, much slower than plaintiff, and as he had no means of knowing but that he would turn north or south at the intersection and even if he continued on east, plaintiff judged he had ample time to himself turn east on Fifty-fifth Street ahead of defendant, he turned to the right intending to go east along the south side thereof; but his car, owing to the slippery condition of the streets, began skidding and continued to skid until, when he was about ten feet east of his starting point, defendant's car collided with his and caused the injury. He says defendant made no effort to swerve to one side or to slow his speed or to avoid a collision after he saw, or could have seen, plaintiff in front of him if he had been observing as he should have been.

As a part of his case in chief, plaintiff introduced portions of defendant's deposition, as admissions against interest. In the deposition defendant says he was not going over ten or fifteen miles an hour *at the time of the collision.* (The outside limit of his statement

as to speed, was thus greater than plaintiff's statement of defendant's speed when plaintiff first saw him on Fifty-fifth Street west of the intersection, so that the jury could come to the conclusion that instead of *slowing* his own speed, he had *increased* it after reaching the west edge of said intersection.)  Defendant testified in said deposition that plaintiff's car was going from thirty-five to forty miles per hour when he (defendant) *first saw it;* that he didn't seem to make any change in his speed at all, "until he hit a certain point where he skidded when he threw on his brakes."  Defendant said he "imagined" plaintiff was forty or fifty feet south of him when he (plaintiff) put on his brakes and started skidding, and the plaintiff, in his skidding car, "came forward, right square at me, went right into me."  Defendant further testified that when he saw plaintiff coming toward him, he (defendant) immediately picked up speed as fast as he could.  When asked this question, his answer was, "Yes, I didn't put my brakes on," and he also testified that this was when the accident occurred.  At that time, according to defendant, his own car was headed due east and was always headed in that direction "until after the collision."

He also admitted that his main objective was to *get across Brookside as fast as he could,* and that at no time before the impact, did he apply his brakes or sound his horn as there was "no use of sounding the horn;" his brakes were all right.  Defendant further testified that, with his brakes in the condition they were, and the street in the condition it was, and his car going at fifteen miles per hour, the shortest distance he could have stopped his car, with safety to himself, was "about sixty feet;" if he were going only ten miles an hour, he could stop in five or six feet, and if his car was going only five miles an hour he could have stopped in about three or four feet. He further testified that after he made his stop on the west side of Brookside, and started up, the front end of his car traveled forty-three feet until the crash occurred.  Defendant testified that his wife called his attention to plaintiff's car by saying to him as he started up, "That man is coming pretty fast."  When defendant made the stop west of the intersection, he saw plaintiff's car coming north when he (plaintiff) was about 135 or 140 feet away and then he (defendant) started across, directly east.  Under cross-examination of his counsel, he stopped his car on Fifty-fifth at the west side of the intersection of Fifty-fifth and Brookside.  His counsel then asked, "Did you come to a complete stop?  A. *Maybe I did.*  Q. How long did you stay there when you stopped?  A. Started up immediately.  Q. Did you shift gears?  A. No. I was in the first gear when I started across the driveway coming on Fifty-fifth.  Q. *What gear were you in when this accident occurred?*  A. *I was either in first or second.*"  Defendant also admitted he was on plain-

tiff's side of the intersection, that is, on the plaintiff's right-hand side, or east side, of the intersection, when the accident occurred. Defendant said the back end of his car was still in about the middle of the intersection when the accident occurred. His windshield wiper was working, and he admitted he had a clear view ahead. He couldn't remember when he had had any work done on his four-wheel brakes on his five-passenger sedan, Cadillac 1928-model. Defendant said that the front end of plaintiff's car hit defendant's right rear fender and wheel. He couldn't "remember just exactly" whether the entire front part of plaintiff's car ran into the side of his car; it might have been the right side of plaintiff's car, he (plaintiff) might have swerved to the left a little bit there." His counsel asked:

"Q. Did you see the two cars actually come together? A. I was sitting on that side."

But when his counsel suggested and asked if he were not sitting on the left side (which he would have to be if he were driving), he corrected his testimony by saying, "A. No, I was sitting on the left side; my wife was on that side."

"Q. Do you know which way the driver of the other car was looking as he was coming up to the intersection? A. I don't know anything about it.

"Q. Didn't see him until after the collision? A. I did not see him personally.

"Q. His face? A. Yes.

"Q. So far as you could see, you don't know what part of the front of his car came in contact with yours, do you? A. I thought he came right on, head-on.

"Q. I mean, do you know of your own knowledge? A. Of my own knowledge, his right side that he was on struck my left rear fender, just pretty near cleared him.

"Q. Did your car immediately stop when the collision occurred? A. My car stopped immediately, facing southeast.

"Q. Now, which end of your car was pulled around? A. Pretty near tipped my car over, my left was pretty near raised off the ground, tipped me right off. I mean my right rear fender; pretty near tipped my car over.

"Q. Did your car swerve, or was it shoved around? A. Shoved my car around, yes.

"Q. Which end of your car was shoved around? A. So I was facing southeast, more to the south.

"Q. Where were you when the car stopped, where was your car when the car stopped? A. My car was about, I should say, about eight feet from the curbing.

"Q. Which curb? A. From the right curb.

"Q. That is the east curb? A. The east curb.

"Q. Was it east of the east curb? A. No, it was west of the east curb.

"Q. You mean it was still in the intersection proper? A. Yes.

"Q. You say it was eight feet from the east curbing? A. Yes.

"Q. Which part of it was eight feet? A. The front end.

"Q. Now, with reference to the north curb of Fifty-fifth Street, where was your car after the collision? A. I was on the south side of the street.

"Q. How close was the front end of the car to the south curbing? A. Eight feet.

"Q. To the south curb? A. Yes.

"Q. And where was Mr. Power's car after the collision? A. His was straight ahead, facing north.

"Q. Facing due north. And where in the intersection was it standing? A. He was right up against my car, and we pulled them apart.

"Q. The two cars stayed together after they hit? A. They did, yes."

The above and foregoing is the testimony bearing on the facts as to the collision. From which we may very properly observe that the evidence from which a case for plaintiff, if any, is to be derived, is not such as to *conclusively* show that no case for plaintiff was made; but that it was one for the jury to pass upon. That being the situation, we must accept the jury's finding.

It is true, the question of whose negligence it was that caused an injury, must be determined from the evidence; and especially the issue of a defendant's negligence under an alleged violation of the humanitarian rule, must be determined from the evidence tending to show conduct of the defendant at the time and after the peril of the injured one arose. [Taylor v. Superior Axy-Acetylene Co., 73 S. W. (2d) 186.] Moreover, the evidence must disclose that a reasonably sufficient time was afforded defendant, after he discovered or should have discovered plaintiff's peril, in which it was reasonably possible for him to act in preventing the injury, and a failure to so act, before a recovery can be had. [Goodman v. Schwandt et al., 318 Mo. 666.] A showing of a mere possibility that the accident might have been avoided, is not sufficient to authorize a recovery. [Markowitz v. Metropolitan St. Ry., 186 Mo. 350; 359.] And if the evidence in plaintiff's favor, whether coming from him or defendant, or both combined, made a case for plaintiff, the question must be submitted to the jury. If it conclusively does not reveal a case, as in the case of Shepherd v. Chicago, R. I. & P. Ry. Co., 72 S. W. (2d) 985; 987, it should be taken from the jury. The fact that there is evidence from defendant's witnesses, which dis-

putes that supporting plaintiff's case, does not change the situation. The jury must decide the controverted issues, unless the facts relied on to establish plaintiff's case are contrary to well-known scientific facts or the common experience of mankind. The difficulty with defendant's contention that the demurrer to the evidence in the case at bar should have been sustained, lies in the *application* of such contention to the case as presented. The evidence is such that a disputed issue was made, and the jury has determined that issue in plaintiff's favor. Such being the case, and there being evidence to support such finding, we must accept it. [Banks v. Morris & Co., 257 S. W. 482; Grubbs v. Kansas City Public Service Co., 45 S. W. (2d) 71; Millhouser v. Kansas City Public Service Co., 71 S. W. (2d) 160; Zumwalt v. Chicago & A. Ry. Co., 266 S. W. 717.] The trial court correctly ruled on the demurrer to the evidence.

It is next contended that the court erred in refusing to discharge the jury because of alleged prejudicial questions asked by plaintiff's counsel in the examination of the panel of jurors on their *voir dire*. It is said that such improper remarks and questions were many. We can notice only those specified in either the points and authorities or the printed argument of the brief in support of the point mentioned.

Those so specified were:

1. That the jurors were asked if any of them carried "an automobile liability policy in the Standard Insurance Company?" The fact that the record shows no objection made to this question precludes it from being made a ground of reversible error, if it could by any means be considered error.

2. Plaintiff's counsel asked the panel, after stating that the Phister Agency was agent of the Standard, "Would the fact that you knew Mr. Phister and that he is agent in Kansas City for this insurance company"— (The question was never finished because defendant's counsel interrupted by orally moving that the jury be discharged.)

3. The jurors were then asked if any juror was acquainted with anyone associated with the Standard Accident Insurance Company or any of their agents or officers? Did any of them own any stocks, bonds or securities in the Standard Accident Insurance Company? If anyone had been sued for damages for personal injuries growing out of an automobile collision? One juror replied that he had about two years ago, and another said he had one pending now. Several questions were asked, and then plaintiff's counsel asked if their acquaintance, friendship, or the fact that they had been sued would tend to influence them one way or another in arriving at a verdict. Defendant's counsel objected and the court *sustained* the objection. During the preceding questions, no objection was made, until a juror

who had said the judgment was rendered against him, was asked, "Were you insured in that case?" To which the juror replied, "Yes," whereupon defendant again moved that the jury be discharged which motion the court overruled. We see no reversible error herein. The answers of the jurors disclosed some reason for inquiry into the matters inquired about. It does not appear that the questions were asked merely to suggest that defendant was insured in this case. In fact, no mention of this was made. The court did not commit reversible error in refusing to discharge the jury. [Wendel v. City Ice Co., 22 S. W. (2d) 215, 220; Olian v. Olian, 59 S. W (2d) 672, 674.] Generally, in a personal injury action, the fact that defendant is insured should not be brought before the jury. [Wack v. Schoenberg Mfg. Co., 53 S. W. (2d) 28.] And if it conclusively appears that a plaintiff has gone out of his way solely in order to get that fact before the jury, he need not be surprised when he receives the just punishment such tactics and duplicity deserve. But such is not shown in this case. [See also Smith v. Star Cab Co., 19 S. W. (2d) 467; Pinter v. Wilson, 46 S. W. (2d) 548, 549; Maurizi v. Western Coal & Mining Co., 11 S. W. (2d) 268, 274.]

If, by any reasonable apprehension, the mention of insurance, as hereinabove shown, could be thought prejudicial, it was certainly removed by defendant's given Instruction C which told the jury that "the sole parties to this cause are Riley M. Power, plaintiff, and Julius Frischer, defendant, and that no insurance company is a party hereto, and as a result thereof you are instructed to disregard and ignore in your deliberation any reference heretofore made to any insurance company."

Whether such instruction was more than defendant was entitled to under the circumstances of this case, we need not say.

Considering the injuries the record discloses that plaintiff suffered, we are clearly without power, justification or authority to say that the verdict of $1500 is excessive. Nor can it be said that a verdict for plaintiff is the result of bias and prejudice, or against the weight, or the greater weight, of the evidence. Those questions were more properly for the consideration of the trial judge on the motion for a new trial, and not for the appellate court. It follows that the judgment must be, and it is, affirmed. All concur.