234 S.W.2d 223 (1950)
STRAWN
v.
COCA-COLA BOTTLING CO. OF MISSOURI.
No. 21455.
Kansas City Court of Appeals. Missouri.
November 20, 1950.
Alexander, Ausmus & Harris, and Ralph L. Alexander, all of Columbia, for appellant.
Lyman M. Cleek, Columbia, for respondent.
BOUR, Commissioner.
This is an action for damages based upon an alleged breach by defendant of an implied warranty as to the fitness for human consumption of a certain bottle of Coca-Cola purchased by plaintiff from the Vets Cab Company. The action was brought against the Coca-Cola Bottling Company of Missouri, which sold the bottle of Coca-Cola in question to the Cab Company. Verdict and judgment were for plaintiff in the sum of $106, and defendant has appealed.
*224 At the time in question plaintiff was an employee of the Vets Cab Company, which had an office and place of business in Columbia, Missouri. About 2:30 in the afternoon of June 14, 1949, plaintiff obtained a bottle of Coca-Cola from a vending machine located in the office of the Cab Company. He testified: "I just put a nickel into the slot and I pulled the lever and reached down and got my `coke' took the cap off and started drinking. * * * I drank quite a bit of it and I felt something hit my lips and I looked in there." He then showed the bottle to several men who were present, including Arch Turnbough, Billy Phillips, and Gene Burnett. Turnbough called Ed Roberson, president of defendant corporation, and the latter went to the office of the Cab Company and examined the contents of the bottle in question. Roberson testified that he thought the substance in the bottle was a piece of a cigar. Plaintiff's testimony and that of Turnbough, Phillips, and Burnett was to the effect that the bottle contained "cigar wrappings or a cigar butt" and "a spider or bug of some kind." Burnett stated that he saw a "bug or spider" in the bottle, and that the insect "was in parts. There were two pieces floating around in it. * * * It was mushy. * * * It seemed rotten. It had been in there some time." As hereinafter stated, plaintiff became ill after he drank a portion of the Coca-Cola.
The record shows that defendant was engaged in manufacturing, bottling, selling, and distributing to the retail trade, to be resold to the general public, a bottled drink known as Coca-Cola; and its bottling plant was located in Columbia, Missouri. The Coca-Cola sold to the public by means of the above mentioned vending machine was bottled by defendant at its Columbia plant, and sold and delivered by defendant to the Cab Company; and the vending machine was owned by defendant. The evidence was that the machine held two cases of bottled Coca-Cola, and that the Cab Company bought four or five cases of defendant's Coca-Cola every day. Gene Burnett, who was one of the owners of Vets Cab Company at the time in question, testified as follows:
"Q. Did you buy `coke' in large or small quantities? A. We would buy four or five cases a day. * * *
"Q. You never had cases of `coke' lying around for long periods of time? A. No, sir.
"Q. Who serviced the Coca-Cola cabinet? A. If we were busy, Belcher (defendant's delivery man) would service the machine and take his money and leave; and if not, we would."
Ed Roberson, defendant's president, testified in detail regarding defendant's method of cleaning, filling, capping, and inspecting bottles in the process of bottling Coca-Cola. It appears from his testimony that all of defendant's machinery was modern; that its method of bottling Coca-Cola was in keeping with good practice; and that all bottles were capped under 300 pounds pressure. He admitted, however, on cross-examination, that he had seen empty Coca-Cola bottles returned to defendant's plant with all sorts of things in them, such as "cigar butts, mice, bugs, spiders and clothespins," and he testified:
"Q. But even with all the precautions and your up-to-date machinery, you find it is still necessary for you to have your inspectors there after the bottles are cleaned? A. Yes, sir. * * *
"Q. Have you ever had any of your customers, in stores or other customers, ever return a bottle of `coke' to you for the reason it was defective? A. Sure.
"Q. In other words, it went through the two inspections under the light and you sent it out, but there were some bottles that would come back to you for the reason they were defective? A. Sure * * * the human element."
Defendant contends that the trial court erred in overruling defendant's motion for a directed verdict at the close of all the evidence, for two reasons, the first being that "there was no evidence that the bottle of Coca-Cola contained any injurious foreign matter while in the possession and control of the defendant." Defendant says that plaintiff offered no evidence to account for the bottle from the time it was *225 delivered to the office of the Cab Company until he drank a portion of its contents; that plaintiff's own witnesses testified that employees of the Cab Company serviced the vending machine at various times; and that all questions as to what occurred after defendant delivered cases of Coca-Cola to the Cab Company, and "whether or not the waste matter got into the bottle before it left defendant's possession or afterwards are left to pure speculation, guesswork and conjecture."
Defendant does not deny that it manufactured and bottled the Coca-Cola in question, or that it sold and delivered the same to the Cab Company. Defendant's evidence was that all bottles were capped under 300 pounds pressure. The evidence was undisputed that the bottle was capped when plaintiff took it from the vending machine; that he removed the cap, started drinking the contents at once and kept the bottle in his possession until he discovered the foreign substance therein; and that he immediately exhibited the bottle and its contents to several bystanders in the office of the Cab Company. This evidence not only refutes any suggestion that the foreign matter might have gotten into the bottle after plaintiff opened it, but when coupled with other evidence in the case it tends to show that the foreign matter was in the bottle before it was capped at defendant's plant. Other evidence offered by plaintiff disclosed that the insect in the bottle was so decomposed as to indicate that it had been in the bottle for quite some time. Furthermore, it will be recalled that the vending machine held two cases of Coca-Cola, and that the Cab Company bought Coca-Cola from defendant every day and in lots of only four or five cases, which warrants the inference that the bottle in question had been out of defendant's possession only a short time. We notice, too, the testimony of defendant's president that despite the precautions taken by defendant some defective bottles of Coca-Cola were sent out to the trade. In the face of the foregoing evidence, we would not be justified in holding that plaintiff's case was based on "pure speculation, guesswork and conjecture." The mere fact that employees of the Cab Company serviced the vending machine at various times was not sufficient to take the case from the jury. It was not incumbent upon plaintiff to prove that it was impossible for any one to tamper with the bottle from the time it was delivered to the office of the Cab Company until he drank a portion of its contents.
Applying the well-known rule that plaintiff must be given the benefit of all favorable inferences arising from all the evidence, and that defendant's evidence must be disregarded when it does not strengthen plaintiff's case, we conclude that the evidence was sufficient to submit to the jury on the issue of whether the foreign substances were in the bottle at the time defendant delivered it to the Cab Company. This conclusion is supported by Hutchison v. Moerschel Products Co., 234 Mo.App. 518, 133 S.W.2d 701; Holyfield v. Joplin Coca-Cola Bottling Co., Mo.App., 170 S. W.2d 451. See also Beyer v. Coca-Cola Bottling Co., Mo.App., 75 S.W.2d 642; Nemela v. Coca-Cola Bottling Co., Mo. App., 104 S.W.2d 773.
Defendant also contends that the trial court erred in overruling the motion for a directed verdict because there was no evidence that plaintiff's sickness resulted from drinking the Coca-Cola. The undisputed evidence shows that plaintiff was in a good state of health at the time of drinking the Coca-Cola and had never had any stomach trouble prior to that time; that about an hour after plaintiff drank the Coca-Cola he became nauseated and experienced pains in his abdomen accompanied by vomiting; that he was treated by Dr. Griffith that day and on the following day; that he was confined to his bed for three days during which time he suffered from chills, diarrhea, and abdominal pains; that for two weeks thereafter he was able to work only half time; but that after the two-week period he worked full time. At the time of the trial, which took place about six months after the occurrence in question, plaintiff's only complaint was that he suffered from pains in his abdomen when he awakened in the morning.
Plaintiff's medical witness, Dr. Griffith, testified that plaintiff came to him complaining *226 of "a cramping in the stomach and said that he felt cold and chilly and had been nauseated"; that plaintiff's "body was cool and he had a cool sweat and was rather pale"; that his upper abdomen was rigid; that "his respiration was normal but his pulse was rapid,which we find in food poisoning"; and that plaintiff "was pretty sick when he was in the office." The witness stated that he "made a diagnosis of some form of food poisoning and prescribed for him"; that he advised plaintiff to go home and go to bed, take some medicine, and return the next day; that the next day plaintiff's condition was improved; and that he had not seen plaintiff since that time. Dr. Griffith testified that plaintiff's condition could have been caused by "contaminated" Coca-Cola; that illness due to such a cause would, in some instances, commence within fifteen minutes after the contaminated drink was consumed, although "it may take thirty minutes or an hourdepending on the severity of the contamination"; that the duration of such illness depends upon the "severity of the condition," and continued: "Q. Would you state that the symptoms could be produced from a psychological effect of seeing a bug or cigar wrappings in the bottle? A. A man could get a nausea from such a thing but I don't believe he would get diarrhea and cramps. * * *
"Q. But to cause a diarrhea there would have to be some type of food poisoning, is that right? A. That is right."
Defendant's argument in support of its contention "that the plaintiff has wholly failed to prove that the physical condition experienced by the plaintiff was due to drinking a portion of the bottle of Coca-Cola," is this: The petition alleged that defendant "warranted and represented said beverage as being a pure, harmless, wholesome and safe drink," whereas, the Coca-Cola in controversy was "impure, contaminated, adulterated and poisoned, and not fit for human consumption." Now the defendant says that while plaintiff's evidence tends to show that the bottle contained "waste matter" there is "absolutely no evidence that the bottle of Coca-Cola in question was `impure, contaminated, adulterated and poisoned, and not fit for human consumption,' because of the presence of the waste matter therein." The uncontradicted evidence was that the "waste matter" consisted of tobacco and a partly decomposed insect. In view of that evidence and the evidence concerning plaintiff's condition after drinking the Coca-Cola, including the medical testimony, we believe there was sufficient evidence upon which to base a finding that the Coca-Cola was "impure, contaminated, adulterated and poisoned, and not fit for human consumption," as alleged in the petition. This very question was determined adversely to the position of defendant here in the case of Beyer v. Coca-Cola Bottling Company of St. Louis, Mo.App., 75 S.W.2d 642, 646, where the court said: "Quite obviously, we think, if drinking from the bottle produced the symptoms above noted, then the jury had the right to find that the contents of the bottle were `poisonous, dangerous, sickening, and injurious,' as alleged in the petition; those words not having been used, as we understand the case, in any particularly technical sense so as to have necessitated that plaintiff prove what the precise chemical analysis of the contents of the bottle might have been." We think the evidence in the instant case was sufficient to warrant the jury in finding that plaintiff's illness resulted from drinking a portion of the contents of the bottle in question.
We hold, therefore, that the trial court committed no error in overruling defendant's motion for a directed verdict at the close of all the evidence.
Defendant's last contention is that "the court committed error in allowing and permitting plaintiff's attorney to interrogate the jury panel in reference to their relationship and connection with the Hartford Accident and Indemnity Company, and in failing to discharge said jury panel because thereof." The record does not show that defendant objected to any of the questions asked by plaintiff's counsel in the examination of the panel of jurors or that defendant requested the trial judge to discharge the panel. The record discloses that after plaintiff's counsel completed his *227 examination and announced that the panel was acceptable to him, counsel for defendant said: "The panel is acceptable to us." Under these circumstances, the matters complained of are not reviewable on appeal. Secs. 847.122, 847.140(a), Mo.R.S. A.; Gildehaus v. Jones, 356 Mo. 8, 11, 200 S.W.2d 523; Bulkley v. Thompson, Mo. App., 211 S.W.2d 83, 90; Power v. Frischer, 229 Mo.App. 1056, 1064, 87 S.W.2d 692, 697.
The judgment of the circuit court should be affirmed.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.
All concur.