Christine LEATHERS, Plaintiff-Respondent,

v.

SIKESTON COCA–COLA BOTTLING COM-
PANY, Defendant-Appellant.

No. 7403.

Springfield Court of Appeals.

Missouri.

Jan. 27, 1956.

Briney & Welborn, Bloomfield, for defendant-appellant.

.C. A. Powell, Claude Arnold, Dexter, for plaintiff-respondent.

RUARK, Judge.

This case developed from a photographic film. Plaintiff, Christine Leathers, sued defendant-appellant, Sikeston Coca-Cola Bottling Company, for damages resulting from breach of warranty in pemitting the film to be bottled with the beverage which she drank, and had verdict and judgment in the sum of $750.

The defendant was engaged in the bottling and selling of Coca-Cola at Sikeston, Missouri. Plaintiff, 22 years old and unmarried, was employed as a waitress on the four o'clock to midnight shift at Cubs Cafe on Highway 60 west of Dexter. On the evening of January 28, 1954, plaintiff, as she had a right to do under her arrangement with her employer, went to the cold drink box in the cafe and took therefrom a Coca-Cola bottle which was lying on its side and securely capped. This she uncapped with an opener on the box and took into the kitchen. Out of it she took one drink. She noticed that it had a peculiar taste. Some remark was made concerning it, and two other girls in the restaurant tasted it. One of these girls who testified said the taste was "different." Thereafter plaintiff drank some more from the bottle, so that about a third of the contents of the bottle had been consumed by the three girls, then, to use her words, "I couldn't stand any more of it, so I poured it down the drain." She then noticed a clear photographic film (later said by a defendant witness to be a 35 millimeter movie film, about six inches in length and 29 millimeters wide at the time it was extracted) on the inside bottom of the bottle. The bottle was set away, and the next morning it was observed that there was a black sediment in the bottom, which sediment was later analyzed as silver nitrate. Plaintiff testified that prior to this incident she felt "just fine" and had no stomach trouble; that shortly after drinking from the bottle "I started feeling kind of ill," "car sick," "kind of upset," but did not vomit. A short time later one Dr. Jibben, an osteopathic physician, came into the cafe as a customer. Dr. Jibben was acquainted with plaintiff, having treated her a time or two. He was an associate of Dr. Poe, who was her regular physician. Plaintiff told Dr. Jibben about the incident and showed him the bottle, and he advised her to drink milk. She drank three or four glasses that evening. This occurrence was on Thursday evening. She testified that she felt the same the next day, Friday, and she continued drinking milk; that on Saturday she woke up with a cramping in the pit of her stomach. She called Dr. Jibben and he advised her to drink all the milk that she could hold, and she drank milk exclusively until the following Wednesday. She continued with her regular shift at the cafe and lost no time from work. On Monday, February 1, she went to the office of her regular physician, Dr. Poe, who gave her an intestinal absorbent to soothe the stomach. The dosage of this medicine was heavy at first but was cut down on subsequent visits. The doctor testified that on the occasion of her first visit she appeared to be nervous and upset and had lost four pounds in weight since a previous visit a week or ten days before. She went back to the doctor on February 3, February 4 and again on February 8, when she was finally dismissed as to this complaint. She lost no further weight.

Chemical and medical analysis developed that the base or clear photographic film is made of cotton cellulose. The coating is made of silver nitrate or silver bromide mixed with an albuminous gelatin, usually egg white. The conclusion to be drawn

from the testimony is that the action of the carbon dioxide or carbonic gas in the bottle had caused the silver and albumen to come free from the clear film and either be carried in the liquid as a colloidal solution or deposited on the sides and bottom. Plaintiff's witness, Dr. Poe, testified that silver nitrate is a caustic and there is no medicinal use for it. Dr. Linton, a witness for the defendant, testified that silver nitrate is used extensively, in mild solution, as a cautery and to kill infection; that if taken internally it could produce a toxic effect, but that he thought a person could take two and a half grams internally without any toxic effect, whereas the silver in the coating on the film could not have been more than one-tenth of one gram and would not produce a toxic effect; that had it done so vomiting would have been occasioned immediately.

The first assignment is that defendant was entitled to directed verdict because there was no competent evidence upon which the jury could find that the Coca-Cola which plaintiff drank was bottled by defendant.

Witness Doris Barber testified that she worked at Cubs Cafe from 6:00 a. m. to 2:00 p. m. on all days except Friday; that the Coca-Cola was usually delivered in the morning and she paid for it at time of delivery.

"Q. Do you know where Cubs Cafe gets the Coca-Cola they sell and have in their ice box?

\* \* \* \* \* \*

"The Court: What time are you asking about first?

"Counsel: At that time and shortly before.

\* \* \* \* \* \*

"Witness: As far as I know they get it from Sikeston.

\* \* \* \* \* \*

"Q. At the time you worked there did you know of them getting it from any other source before January 28th?

\* \* \* \* \* \*

"A. Not that I know of."

The witness said that the Coca-Cola was delivered by truck and that the truck had on it the words "Coca-Cola" and "Sikeston"; that she knew the driver when she saw him but didn't know his name was Davis. "I believe that is the way he signed the ticket." Objection to what she believed was sustained. This driver carried receipts with him and gave her one every time she paid. She identified a receipt (which was an exhibit) as "It looks like the ones I usually pay," and said it was like all receipts she got from the driver when she paid for the Coca-Cola. Words of this receipt were, "Coca-Cola Bottling Co., Inc.," "1–25, 1954," (three days before the incident here), "6 Coca-Cola, 9.60," marked "PD." "Total 9.60," signed "Salesman, Davis." At the bottom of the exhibit was, "4 Coca-Cola, 3.20, Total Credit 3.20, Collect 6.40." Upon inquiry as to whether as a matter of fact from time to time the cafe didn't get Coca-Cola from Poplar Bluff, her answer was, "No." One Bill Phillips testified that in January of 1954 he attended to filling the Coca-Cola vending machines at the International Shoe Company in Dexter; that Coca-Cola was delivered to him by a Sikeston Coca-Cola truck; that the driver of this truck was called "Red" Davis; and that he had seen the same truck, the same driver, at Cubs Cafe.

. Lawrence McClellan, called as a witness by the defendant, testified that he had been employed by the Sikeston Coca-Cola Company for seven and a half years, and that he served in the capacity of "foreman and production." He described in some detail the operations of the machinery, caustic and washing vats and other bottle cleaning processes at the plant. Upon cross-examination he was asked:

"Q. And that plant there at Sikeston has exclusive franchise at Dexter, isn't that right? A. I believe so."

He was then asked if it didn't have such franchise prior to January 19. This was objected to as being a conclusion and not

the best evidence. Thereafter the witness answered:

"A. Tell you the truth about it, as far as—they have got a franchise of a certain mileage; now, how far that is, I don't know.

"Q. Don't you know that goes into Dexter? A. I do know he goes into Dexter.

"Q. Does anybody else go into Dexter? A. That I don't know.

\* \* \* \* \* \*

"Q. Do you sell Poplar Bluff or any other company sell the same places of business in Dexter? A. I don't believe so."

The witness testified that one Bob Davis was defendant's salesman deliveryman; that when so doing he operated a Sikeston Coca-Cola Company truck. He also testified that all bottles were capped securely at the plant. The bottle from which plaintiff drank bore in raised letters on the bottom the words "Sikeston, Missouri."

■ In passing upon whether plaintiff made a submissible case we must consider all of the evidence, and all reasonable inferences which can be drawn therefrom, most favorable to the plaintiff, whether such evidence comes from the plaintiff or defendant. Hutchison v. Moerschel Products Co., 234 Mo.App. 518, 133 S.W.2d 701; Sibert v. Boger, Mo.Sup., 260 S.W.2d 569; Tenkhoff v. New York Life Ins. Co., Mo. App., 191 S.W.2d 1005, and reject that which is unfavorable to the plaintiff. Strawn v. Coca-Cola Bottling Co., Mo.App., 234 S.W.2d 223, 225; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601. There was ample evidence that defendant sold Coca-Cola to Cubs Cafe. Proof that no one else sold it Coca-Cola was less substantial. It rests upon the testimony of the witness Barber, who said that "as far as I know" they got their Coca-Cola from Sikeston and that they did not get it from anyplace else that she knew of, that it was usually delivered by a certain truck and by a certain driver (Davis) in the morning

and that she paid for it; upon the testimony of defendant's foreman witness McClellan that he "believed" defendant had an exclusive franchise for Dexter and that he didn't believe any other company sold Cubs Cafe; upon the fact that the defendant *did* deliver Coca-Cola to the cafe three days before the incident; and finally upon the fact that the bottle in question was marked "Sikeston."

■ One question we must determine is whether or not the testimony of McClellan that he "believed" and did not believe had any evidentiary value. "The word 'belief' is equally appropriate to describe a state of mind which regards the existence of a fact as certain and a state of mind which thinks that the fact exists but recognizes a varying degree of chance that it may not exist." Restatement of the Law of Torts, sec. 289d. "One of the definitions of 'belief' is partial assurance, without positive knowledge or absolute certainty. Webster. By another authority it is defined as a persuasion of the truth of a fact, formed in the way of inference from some other fact. Burrill's Law Dict., tit. 'Belief.'" State v. Grant, 76 Mo. 236, 246. Of course, if the testimony of the witness shows the expression is used only to denote a mere guess or speculation on his part, it has no probative value. Armstrong v. Croy, Mo.App., 176 S.W.2d 852; Masonic Home of Missouri v. Windsor, 338 Mo. 877, 92 S.W.2d 713, 716; O'Neil Implement Mfg. Co. v. Gordon, Mo.App., 269 S.W. 636. The use of the phraseology "believe," "think," etc., may in fact signify an opinion which renders a statement inadmissible. Nevertheless, the use of such terms is not conclusive that the witness is stating his opinion, for the language may be used merely to indicate that he is not speaking with entire certainty. In such case the evidence may be received and considered for what it is worth, 32 C.J.S., Evidence, § 439, p. 71; 20 Am.Jur., Evidence, sec. 1178, p. 1028, for the witness is not required to speak with such confidence as to exclude *all* doubts in his mind. His qualification only affects the probative force of his testimony. 20 Am.Jur., Evidence, sec.

768, p. 639; see 4 A.L.R., Annotation, p. 979. The use of such and similar expressions is held to affect the *weight* of the testimony but not to rob it of all its probative value. State v. Brinkley, 354 Mo. 337, 189 S.W.2d 314, 323; Cooper v. Standard Steel Works, Mo.Sup., 190 S.W.2d 237. Especially is this true where there is other testimony which tends to corroborate the fact. Wood v. St. Louis Public Service Co., Mo. Sup., 228 S.W.2d 665, 17 A.L.R.2d 868. While the evidence of McClellan, the evidence of Barber, or the marking on the bottle, each standing alone, would fail to connect the bottle with the defendant, when taken together they are mutually supporting and corroborative and their weight was for the jury. Collectively they make up evidence from which the jury could have found or inferred the defendant's responsibility for the bottle which contained the film. Cases which we think bear some similarity on the facts are Norman v. Jefferson City Coca-Cola Bottling Co., Mo. App., 211 S.W.2d 552; Holyfield v. Joplin Coca-Cola Bottling Co., Mo.App., 170 S.W. 2d 451. We hold against appellant on this assignment.

 The second assignment is that there was no evidence from which the jury could find that plaintiff suffered any injury from drinking the Coca-Cola. The fact that plaintiff, who said she felt just fine before the incident and had had no stomach trouble, received an upset stomach from drinking a beverage which contained *some* quantity of a substance admittedly caustic (in sufficient amount that the taste was noticeable to witnesses), that shortly thereafter she felt ill and "car sick," and the fact that she lost four pounds in weight and responded to a medicine given in treatment for such disorder, we think, when taken together, were sufficient to justify the inference that the condition came from the substance which she drank. The fact that she obeyed the injunction of a doctor and drank quantities of milk might properly have been considered by the jury as having lessened her symptoms. There was also medical testimony that an inflamed stomach could cause headaches. The showing of

symptoms shortly following the drinking of a contaminated beverage has been frequently held sufficient to take the case to the jury on causal connection. Duley v. Coca-Cola Bottling Co., Mo.App., 232 S.W. 2d 801, 805; Strawn v. Coca-Cola Bottling Co., Mo.App., 234 S.W.2d 223, 225, 226; Beyer v. Coca-Cola Bottling Co., Mo.App., 75 S.W.2d 642; Bell v. S. S. Kresge Co., Mo.App., 129 S.W.2d 932; Atkinson v. Coca-Cola Bottling Co., Mo.App., 275 S.W. 2d 41, 46. In Duley v. Coca-Cola Bottling Co., supra (a rusty safety pin case), it was said, 232 S.W.2d loc. cit. 805–806, that it is not necessary to produce chemical analysis or medical testimony where there are symptoms following the drinking "from which the simple, reasonable and common sense inference could be drawn by the jury that plaintiff became sick and was nauseated and was thereby injured, even though not seriously, as the direct result of drinking the Coca-Cola in question." This is a suit for breach of warranty that the content of the bottle was a beverage pure and suitable for consumption. The presence of any foreign body, obnoxious to that purpose, would amount to a breach of that warranty which would permit recovery of some damage, even if such damage were nominal. 77 C.J.S., Sales, § 374, p. 1316; Hutchison v. Moerschel Products Co., 234 Mo.App. 518, 133 S.W.2d 701, 705. If there is any injury and damage (including that of pain of body and mind) flowing from consumption of the impurity the warrantor is liable in such amount of damages as will fairly compensate the injured person. Nemela v. Coca-Cola Bottling Co., Mo.App., 104 S.W. 2d 773, and cases cited.

 Appellant assigns as error that plaintiff's instruction submitting the case was erroneous in containing undue repetition of words tending to inflame the minds of the jury. This instruction is long and it is unnecessary to set it forth haec verba. It hypothesized the facts from plaintiff's standpoint, including a finding that the bottle contained a "poisonous, unwholesome, putrid and foreign substance." These words, in reference to the contents of the bottle, were used three different times.

The only case cited to sustain appellant's contention is Reeves v. Lutz, 191 Mo.App. 550, 177 S.W. 764, 766. In that case evidence and questions and remarks of the court in reference to whether all surgeons frequently burned their patients, as relating to the question whether the surgeon used reasonable skill, were prejudicial; and instructions reiterating the proposition that the defendant was required only to use reasonable skill had a tendency to mislead the jury. The court concluded with the statement that "Such repetition alone is to be condemned." Of course instructions can become erroneous by reason of giving undue emphasis to the theory of one of the parties. Rice v. Jefferson City Bridge & Transit Co., Mo.Sup., 216 S.W. 746. But repetition or elaboration in instructions, where there is no misstatement or misdirection as to the law, is generally considered to be within the trial court's discretion. Harris v. St. Louis Public Service Co., Mo. Sup., 270 S.W.2d 850, 856; Reidinger v. Adams, Mo.Sup., 266 S.W.2d 610. And repetition of a particular phrase or expression is not necessarily prejudicially erroneous. Lankford v. Thompson, 354 Mo. 220, 189 S.W.2d 217, 219; see Raymond on Instructions, sec. 213. The word "putrid" was an improper expression, putrefaction being defined as the "decomposition of animal or vegetable matter, accompanied by fetid odors." Funk & Wagnalls New Standard Dictionary. However, it is difficult to see how the jury could have been misled or inflamed by the expression, since they had heard the evidence and knew what the substance in the bottle was. It has been held that the use of the word "poisonous," when in the conjunctive with words which carried the correct substance of the submission, was not reversible error. Holyfield v. Joplin Coca-Cola Bottling Co., Mo.App., 170 S.W.2d 451; Marra v. Jones Store Co., Mo.App., 170 S.W.2d 441, 449; see also Foster v. Kurn, 236 Mo.App. 1149, 163 S.W.2d 133, 139. We think the use of the expression in this case was not reversible error.

Appellant's final assignment is that the verdict of $750 was excessive, and we think it is. We have heretofore related such of the unpleasantness suffered by the plaintiff which we believe the jury might reasonably have found to have been occasioned by drinking the small quantity of contaminated Coca-Cola. In addition to these, the plaintiff testified that she had suffered severe and constant headaches which she still had occasionally; that she had become extremely nervous; that she had considerable difficulty in sleeping; and that in the month of July following the incident (in January) she broke out in a rash of pimples, some of which she still had at trial date. She first testified on direct examination that she was not nervous prior to the incident, but she admitted on cross-examination that she had been "slightly nervous" and had been taking a liquid for her nerves. She said she had had "slight headaches" before the incident and had taken some aspirin.

Her personal physician and witness, Dr. Poe, testified that since September of the year previous he had been treating her for low blood pressure, anemia and "a general run-down condition." He also testified that she, his patient, suffered from a pelvic disturbance which caused painful menstruation. He testified that both low blood pressure and painful menstruation could cause headaches. We think that a considerable portion of plaintiff's ailments, especially those which she said she suffered after her doctor discharged her from treatment for the immediate upset caused by the incident, were not shown to have a causal connection with the injury. Plaintiff must prove more than a purely speculative possibility of injury resulting from the occurrence. Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644; Cox v. Missouri-Kansas-Texas R. Co., 335 Mo. 1226, 76 S.W.2d 411; Derschow v. St. Louis Public Service Co., 339 Mo. 63, 95 S.W.2d 1173; Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312. There was no evidence whatsoever which attributed the outbreak of pimples (some six months later) to the incident at the cafe. The amount of her medical expense was not shown. Plaintiff lost no wages, nor is it shown that she suffered any lasting effects, and we think

the sum of $250 would be fair and adequate compensation for the temporary illness and inconvenience which she did suffer.

The case will be affirmed upon condition that she will within ten days from the date of this opinion file in this court a remittitur, as of the date of the original judgment, of $500. Otherwise the case will be reversed and remanded. It is so ordered.

McDOWELL, P. J., and STONE, J., concur.